277 F.3d 243 (2nd Cir. 2002)
 NEIL D. LEVIN, SUPERINTENDENT OF INSURANCE OF THE STATE OF NEW YORK, AS LIQUIDATOR OF NASSAU INSURANCE COMPANY, IN LIQUIDATION, PLAINTIFF-APPELLEE-CROSS-APPELLANT,
v.
TIBER HOLDING CORPORATION, DEFENDANT-APPELLANT-CROSS-APPELLEE.
 Docket No. 00-9579
 UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
 Argued: September 19, 2001
Decided January 11, 2002
 
 Appeal from a judgment entered by the United States District Court for the Southern District of New York (Stein, J.), holding Tiber Holding Corporation liable for aiding and abetting civil contempt of a 1985 consent order.
 Affirmed in part, and vacated and remanded in part.[Copyrighted Material Omitted]
 Thomas E. Zemaitis (Matthew J. Borger, on the brief), Philadelphia, Pa, for Defendant-Appellant-Cross-Appellee.
 William F. Costigan, New York, Ny, for Plaintiff-Appellee-Cross-Appellant.
 Before: Meskill, Jacobs, and Cabranes, Circuit Judges.
 
 Dennis Jacobs, Circuit Judge
 
 1
 Appellant Tiber Holding Corporation ("Tiber") appeals from an order of the United States District Court for the Southern District of New York (Stein, J.), imposing sanctions for contempt of a 1985 consent order. The underlying controversy and the present appeal arise out of transactions between and among entities controlled by Richard A. DiLoreto or his family, either directly or through Tiber, a domestic corporation headed by DiLoreto.
 
 
 2
 Tiber was (but is no longer) the indirect owner of both: (A) Nassau Insurance Company, an insurer now in liquidation under the supervision of the Superintendent of Insurance of the State of New York (the "Liquidator"), and (B) one of Nassau's reinsurers, Ardra Insurance Company, Ltd., a Bermuda Corporation. In the course of an action initiated by the Liquidator in New York state court, Ardra entered into a consent order that decreed in relevant part that "Ardra... its officers, directors, shareholders and assigns... shall... not... remove, transfer or convert in any manner whatsoever any assets whatsoever of defendant Ardra located anywhere in the United States." Joint Appendix at 168, Levin v. Tiber Holding Corp. (2d Cir. 2001) (00- 9579) [hereinafter J.A.].
 
 
 3
 In December 1990, Tiber contracted to sell Ardra to an entity called Corporate Holding Corporation ("Corporate Holding"), of which Mr. DiLoreto was the sole shareholder, sole director, and sole officer. Pursuant to the Tiber/Corporate Holding agreement, Tiber promised
 
 
 4
 * to maintain Ardra's capital and surplus at no less than $125,000 over a five-year period during which Corporate Holding was to make payment on the acquisition, and
 
 
 5
 * to pay Ardra's legal fees and expenses in its existing litigation.
 
 
 6
 The District Court: (1) found that Ardra was the third party beneficiary of the Tiber/Corporate Holding agreement; (2) held that seventeen Tiber payments made between December 1990 and December 1995, ostensibly pursuant to Tiber's obligations (under the Tiber/Corporate Holding agreement) to maintain Ardra's capital and surplus and to fund its legal fees, were United States-based assets of Ardra that were diverted from the Liquidator by payment to Ardra in Bermuda; and (3) ruled that this diversion constituted aiding and abetting of contempt of the 1985 consent order. At issue are seventeen payments, one of which was a $50,000 check sent directly to Ardra, and sixteen of which were channeled payments sent indirectly to Ardra through a series of Tiber- controlled companies in the United States and abroad.
 
 
 7
 The district court rejected the Liquidator's argument that Tiber was in contempt as a shareholder of Ardra bound directly by consent order, reasoning that by the time Tiber made the payments, it had sold its shares to Corporate Holding. However, the district court accepted the Liquidator's alternative argument that Tiber was in contempt as an aider and abettor, on the theory summarized above. Finally, the district court rejected the Liquidator's claim that four other checks, delivered directly from Tiber to Ardra before or after the expiration of the Tiber/Corporate Holding agreement (i.e., before and after the period December 1990 to December 1995), qualified as assets of Ardra located in the United States because they were drafted in the United States notwithstanding their delivery abroad.
 
 
 8
 For reasons stated in this opinion, we agree (l) that Tiber, no longer a shareholder, was not directly bound by the consent order after December 1990 and could be held in contempt if at all only as an aider and abettor; and (2) that Tiber was a third party beneficiary of the Tiber/Corporate holding agreement. We also conclude that the Liquidator's cross-appeal is without merit. However, because, on the record before us, there is no sufficient finding that Ardra itself violated the consent order, we vacate the judgment and remand the cause to the District Court for proceedings not inconsistent with this opinion.
 
 I.
 
 9
 From 1988 until present, Richard A. DiLoreto has served as principal officer of Tiber, a corporation domiciled in the United States. [A 146]. Through a subsidiary, Tiber owned Nassau Insurance Company. Some or all of Nassau's risks were reinsured by Ardra, a Tiber-owned, DiLoreto-led corporation, formed in Bermuda for the specific purpose of serving Nassau's reinsurance needs.
 
 
 10
 In 1984, Nassau was ordered into liquidation. [A 147]. The Liquidator, as a judgment creditor of Ardra, initiated a New York state action against Ardra, and on June 28, 1985, entered into a consent order with Ardra, which decreed:
 
 
 11
 Ardra... its officers, directors, shareholders, and assigns... shall, for so long as this action is pending, not... expend, obligate, promise, assign, pay, remove, transfer or convert in any matter whatsoever any assets whatsoever of defendant Ardra located anywhere in the United States....
 
 
 12
 J.A. at 168.
 
 
 13
 In addition to his active role in these corporations, DiLoreto also was the sole officer, director, and shareholder of Corporate Holding. [A 147]. On December 3, 1990, Tiber entered into an agreement to sell Ardra to Corporate Holding Corporation. [A 147]. Tiber agreed to sell its outstanding Ardra shares to Corporate Holding for $50,000 (paid over five years) plus the value of Ardra's "shareholder net equity" as of December 3, 1995. J.A. at 174. Additionally, Tiber promised both to maintain Ardra's capital and surplus at no less than $125,000 and to pay Ardra's legal fees and expenses in Ardra's existing litigation until December 3, 1995. [A 148]. Finally, Corporate Holding had the right (which it did not exercise) to rescind the transaction "at any time during the next five years," on condition that it "forfeit all money paid to the Seller under the agreement." J.A. at 148.
 
 
 14
 Between 1989 and 1996 Tiber made five separate payments to Ardra in Bermuda by checks signed in the United States. However, only one of those payments ($50,000 on April 9, 1991) was made during the five-year existence of the Tiber/Corporate Holding Agreement (three were made beforehand, one was made afterward). [A 148].
 
 
 15
 Additionally, over several years Ardra received a number of other payments routed from Tiber to Ardra through a chain of Tiber-owned subsidiaries: Tiber would first deliver these payments to Sondam Investments N.V. ("Sondam"), a Netherlands Antilles subsidiary of Tiber which only does business with other companies associated with DiLoreto; Sondam then would pass the money on to Nara Insurance Co. ("Nara"), a Bahamas Corporation established by DiLoreto; [A 148-49] Nara, in turn, would send the funds to Ardra. Generally, the payments would course along the chain in a matter of days, and the amount Tiber initially paid Sondam would equal or closely approximate the amount Ardra ultimately received from Nara. [A 150-51; Blue 35]. During the five-year existence of the Tiber/Corporate Holding agreement, Tiber channeled sixteen payments to Ardra.
 
 
 16
 On November 11, 1998, the Liquidator filed a contempt petition against Tiber in New York Supreme Court. The Liquidator argued that Tiber's payments to Ardra effectively dissipated Ardra's domestic assets and thereby violated the 1985 consent order. Tiber removed the case to the Southern District of New York, and, after a one-day bench trial, the district court held that Ardra, as a third party beneficiary of the Tiber/Corporate Holding agreement, had a possessory interest only in the direct and indirect payments made during the existence of the agreement, and therefore these seventeen payments (and only these seventeen) constituted domestic assets of Ardra prior to transfer from the United States by Tiber. According to the district court, by transferring these seventeen payments to Ardra in Bermuda (either directly or through the chain) Tiber aided and abetted contempt.
 
 
 17
 On appeal, Tiber argues that the seventeen payments were not transferred pursuant to the Tiber/Corporate Holding agreement. Rather, Tiber maintains that it made these payments in fulfillment of long pre-existing, inter-corporate obligations. Specifically, Tiber maintains that Ardra was compelled by Bermuda law in the early 1980s to divest itself of shares of its parent, Tiber, and transfer them to Nara in consideration for a loss-portfolio transfer of some millions of dollars in reinsurance. Nara transferred the bulk of those Tiber shares to Sondam in exchange for some millions of dollars in interest-bearing 30- year bonds; and Sondam transferred the Tiber shares it thus acquired to Tiber in exchange for a 30-year bond in an equal amount bearing 1% more interest.
 
 
 18
 It is Tiber's premise, which the district court rejected, that the disputed payments from Tiber to Ardra that fulfilled (or obviated) Tiber's obligation to maintain Ardra's capital surplus were periodic payments on the bonds from Tiber to Sondam and from Sondam to Nara and that Ardra ultimately received those funds as reinsurance payments from Nara.
 
 II.
 
 19
 We review a district court's findings of fact for clear error and its holdings of law de novo. White v. White Rose Food, 237 F.3d 174, 178 (2d Cir. 2001).
 
 
 20
 As an initial matter, the district court did not clearly err when it found that Tiber's payments to Ardra were made in accordance with Tiber's obligations under the Tiber/Corporate Holding agreement. Tiber's attempt to rationalize the circuitous transfers as intercorporate reinsurance and bond payments fails by DiLoreto's own admissions. In a 1998 deposition, DiLoreto acknowledged that "[d]uring the period December 3, 1990 to December 3, 1995,... Tiber transferred funds from its United States bank account to Ardra for payment of legal fees and expenses and to maintain the capital and surplus account of Ardra at no less than $125,000." J.A. at 197. Additionally, DiLoreto admitted, under cross-examination, that he was unaware whether anyone was "keeping track of the bonds... [,] whether they were being paid... [or] whether they were real." J.A. at 150. Finally, there is no written record indicating the existence of the supposed loss-portfolio transfer between Ardra and Nara. [A 149].
 
 
 21
 Having determined that Tiber made the payments pursuant to the Tiber/Corporate Holding agreement, the district court held: (1) that Ardra was a third party beneficiary under the contract and that its third party rights constitute intangible property located in the United States; and (2) that this property constituted domestic Ardra assets subject to the consent order.
 
 
 22
 As to the first ruling, the district court properly held Ardra to be a third party beneficiary of the Tiber/Corporate Holding agreement. Under New York law, a third party is an intended (as opposed to incidental) beneficiary of a contract
 
 
 23
 if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.
 
 
 24
 Restatement (Second) Contracts § 302; see also Fourth Ocean Putnam Corp. v. Interstate Wrecking Co., 485 N.E.2d 208, 211-12 (N.Y. 1985).
 
 
 25
 The Tiber/Corporate Holding agreement specifically included Ardra as a direct beneficiary of Tiber's promise. Cf. Trans-Orient Marine Corp. v. Star Trading & Marine, Inc., 925 F.2d 566, 573 (2d Cir. 1991) ("An intended third party beneficiary will be found when it is appropriate to recognize a right to performance in the third party and the circumstances indicate that the promisee intends to give the third party the benefit of the promised performance."); Cauff, Lippman & Co. v. Apogee Finance Group, 807 F. Supp. 1007, 1020 (S.D.N.Y. 1992) ("Although the parties' intention to benefit the third party must be gleaned from the face of the contract,.... the defendant's obligation to the third-party beneficiary need not be explicitly stated in the contract itself." (internal citations omitted)). Additionally, Tiber rendered performance of its obligations directly to Ardra. See Flickinger v. Harold C. Brown & Co., 947 F.2d 595, 600 (2d Cir. 1991) (holding that a third party will be deemed an intended beneficiary where performance is rendered directly to it under the terms of the contract); 22 N.Y. Jur.2d Contracts § 304 ("Where the terms of the contract necessarily require the promisor to confer a benefit upon a third person, then the contract contemplates a benefit to that third person, and this is ordinarily sufficient to justify third-party-beneficiary enforcement of the contract, even though the contract also works to the advantage of the immediate parties thereto.").
 
 
 26
 It is inconsequential that Corporate Holding retained a right of rescission, because Corporate Holding's right of rescission was never exercised. Ardra at all times retained its right as beneficiary to demand that Tiber fulfill its contractual obligations. See Brewster v. Kable News Co., 45 N.E.2d 426, 427 (1942) (holding that a third party beneficiary contract that will terminate upon the happening of a contingency will remain in force until such contingency occurs).
 
 
 27
 Because Ardra was a third party beneficiary of the Tiber/Corporate Holding Agreement, the district court properly held that Tiber's obligations to Ardra under the agreement constituted "intangible [Ardra] property" located in the United States. See ABKCO Industries, Inc. v. Apple Films, Inc., 350 N.E.2d 899, 901-02 (N.Y. 1976), (holding that contractual interests constitute "intangible property" which has its situs in the place where the party from whom "performance is required by the terms of the contract" is located).
 
 
 28
 The district court's second ruling is more problematic. While an encumbered payment made for a specific contractual purpose (e.g., maintaining Ardra's capital or paying its legal bills) does constitute intangible property, it may not qualify as "any asset" as that term is used in the consent order. The district court held that Ardra's limited contract rights were subject to the consent order. However, some (if not all) of the payments under the Tiber/Corporate Holding agreement were slated exclusively for satisfaction of Ardra's legal fees. The district court's ruling therefore would sanction the Liquidator's effort to deny Ardra funds that conceivably would be used by Ardra to defend itself against the Liquidator's claims. Nevertheless, we are not prepared to hold the ruling in error. See Beers v. Shannon, 73 N.Y. 292, 299 (1878) (defining an asset to include "every... species of personal property" (internal quotations omitted)); Black's Law Dictionary 112 (7th Ed. 1996) (defining an asset as "[a]ll the property of a person... available for paying debts.").
 
 III.
 
 29
 Even if payments to Ardra under the Tiber/Corporate holding agreement constitute domestic Ardra assets subject to the consent order, Tiber itself was not directly bound by the consent order. [A 153]. The consent order, according to its unambiguous text, applied only to Ardra's "officers, directors, shareholders, and assigns" (emphasis added)--a status Tiber no longer held after it agreed to sell its shares in Ardra to Corporate Holding on December 3, 1990. Consequently, the district court properly held that Tiber, as a former shareholder, could commit contempt only as an aider or abettor. See Alemite Mfg. Corp. v. Staff, 42 F.2d 832, 832-33 (2d Cir. 1930) ("[N]o court can make a decree which will bind any one but a party;... it cannot lawfully enjoin the world at large, no matter how broadly it words its decree.... Thus, the only occasion when a person not a party may be punished, is when he has helped to bring about... what [the decree] has power to forbid...."); McCormick v. Axelrod, 453 N.E.2d 508, 513 (N.Y. 1983) (per curiam) (holding that a party not included in a court order may be held in contempt of that order if that party assists an included party's violation).
 
 
 30
 The Liquidator's cross-appeal asks us to credit the argument that "[a]nyone fitting th[e] description" of shareholder at the time the Consent Order was issued "became subject to the Consent Order so long as it remained in effect," regardless of whether her status subsequently changed. Appellee's Brief at 11, Levin v. Tiber Holding Corp. (2d Cir. 2001) (00-9579). However, under New York law, all ambiguity in a judicial mandate will be construed strictly to the benefit of the party facing allegations of contempt. Mahopac Teachers Ass'n v. Board of Education of the Mahopac Central School Dist., 533 N.Y.S.2d 520, 521 (2d Dept. 1988). We would therefore resolve all ambiguity in Tiber's favor. Accordingly, we reject the Liquidator's argument and hold that liability will only lie if Tiber aided and abetted contempt.
 
 IV.
 
 31
 Before a party can be found guilty of aiding and abetting civil contempt, the court must find: (1) that the party subject to the court's mandate committed contempt; and (2) that another party assisted the enjoined party. See Alemite, 42 F.2d at 833. "[T]he party seeking to hold another in civil contempt bears the burden of proof" to establish the offense by clear and convincing evidence. Beverina v. West, 684 N.Y.S.2d 363, 363 (3d Dept. 1999); see also Powers v. Powers, 653 N.E.2d 1154, 1157 (N.Y. 1995); Stringfellow v. Haines, 309 F.2d 910, 912 (2d Cir. 1962) ("[I]n civil contempt... [p]roof of violation must be clear and convincing."); Yalkowsky v. Yalkowsky, 461 N.Y.S.2d 54, 55 (2d Dept. 1983) ("The party making the application for a civil contempt... has the overall burden of proof to establish, by clear and convincing evidence, that the court order... has been violated."). In the context of civil contempt, the clear and convincing standard requires a quantum of proof adequate to demonstrate a "reasonable certainty" that a violation occurred. Callanan Indus., Inc. v. White, 510 N.Y.S.2d 230, 231 (3d Dept. 1986).
 
 
 32
 The district court erroneously held that Tiber aided and abetted a violation of the court order without reaching the predicate question of whether Ardra itself committed contempt. See Alemite, 42 F.2d at 833 ("[T]he [defendant] must either abet the [principal], or must be legally identified with him.... [I]f the [principal] is not involved in the contempt, the [defendant] cannot be; the decree has not been disobeyed...."); see also United States v. Paccione, 964 F.2d 1269, 1274 (2d Cir. 1992) ("[A] person who knowingly assists a defendant in violating an injunction subjects himself to civil as well as criminal proceedings for contempt." (quoting Alemite, 42 F.2d at 832) (emphasis added)); Cf. United States v. Karen Bags, Inc., 602 F. Supp. 1052, 1064 (S.D.N.Y. 1985) ("The elements necessary to prove aiding and abetting [criminal contempt] are `the commission of the underlying offense by someone, a voluntary act or omission, and a specific intent that such act or omission promote the success of the underlying criminal offense.'" (quoting United States v. Perry, 643 F.2d 38, 46 (2d Cir. 1981)) (emphasis added)), aff'd sub nom. United States v. Klayminc, 780 F.2d 179 (2d Cir. 1985), rev'd on other grounds, sub nom. Young v. United States, 481 U.S. 787 (1987); United States v. Samaria, 239 F.3d 228, 235 (2d Cir. 2001) ("To convict a defendant on a theory of aiding and abetting [credit card fraud], the government must prove that the underlying crime was committed by a person other than the defendant and that the defendant acted... with the specific purpose of bringing about the underlying crime." (internal quotation omitted) (emphasis added)).
 
 
 33
 The district court specifies no underlying contempt on the part of Ardra, and the Liquidator does not allege any. To satisfy the underlying elements of contempt, the Liquidator would have had to demonstrate that Ardra "had knowledge of and disobeyed a clear, explicit and lawful order of the court and that the offending conduct prejudiced the right of the opposing party." Sager Spuck Statewide Supply Co. Inc. v. Meyer, 723 N.Y.S.2d 732, 733 (3d Dept. 2001) (internal quotations omitted); see also Sacco v. Burke, 764 F.Supp. 918, 921 (S.D.N.Y. 1991) ("The only defenses to civil contempt are (1) that the order claimed to be violated is vague and indefinite as to whether particular action is required or...; (2) that the disobedient party lacked actual knowledge of the terms of the order; or (3) that proof of the party's noncompliance is not clear and convincing." (internal citation omitted)).
 
 
 34
 The Liquidator presented no evidence that Ardra directed Tiber to make its payments in a specific manner or to a particular place, or that Ardra even knew that the money was due it under the Tiber/Corporate Holding agreement.
 
 
 35
 No doubt there is much that seems irregular about Mr. DiLoreto, his roles in these various entities, and their doings with each other. However, rather than holding the Liquidator to its clear and convincing burden, the district court simply posited a violation, holding: "Tiber has not presented credible evidence that the payments were routed from Sondam through Nara to Ardra for any purpose other than to evade the consent order." Levin v. Tiber Holding Corp., No. 98 Civ. 8643, at 12 (S.D.N.Y. Aug. 14, 2000) (emphasis added).
 
 
 36
 Tiber challenges this burden shift and we are inclined to agree. While it was not clear error to find DiLoreto's payments suspect, that, by itself, does not sufficiently demonstrate Tiber's complicity in contempt, or Ardra's commission of the underlying violation. Mr. DiLoreto may be up to something, but whether it is illegal is not Tiber's burden to explain.
 
 
 37
 The only finding by the district court that bears upon any wrongdoing on the part of Ardra is the (conditional) observation that "[i]nsofar as Tiber was aiding Ardra in dissipating assets held in the United States... Tiber was aiding and abetting Ardra in disregarding the order and can be held in contempt." Id. at 9. But that observation merely presumes its own premise, and does not demonstrate or explain how Ardra actively dissipated its assets or to what extent Tiber aided the drain.
 
 
 38
 Nor do we see any way, based on the findings of the district court on the record before us, for the district court to find Ardra liable of violating the consent order as a principal. The various transfers from or to any DiLoreto company do not amount to clear and convincing evidence of wrongdoing on the part of Ardra, even under the Liquidator's theory of events. All Ardra has done, apparently, is receive payment of certain funds, as a third party beneficiary, in its primary place of business (Bermuda), and without more, we cannot conclude that Ardra itself was in contempt.
 
 
 39
 We therefore conclude that the district court's finding that Tiber aided and abetted contempt fails for lack of proof of an underlying malfeasance by Ardra or any other party directly bound by the consent order at the time the challenged transactions occurred.
 
 V.
 
 40
 The Liquidator's cross-appeal argues that the district court erroneously failed to adopt two alternative theories of liability. The first such claim, which we rejected supra, is that Tiber was directly bound by the consent order as a former shareholder. As we discussed, the consent order binds only existing shareholders.
 
 
 41
 The remaining argument is that four checks drawn by Tiber (payable to Ardra) outside the period of the Tiber/Corporate Holding agreement constituted domestic Ardra assets in the hands of Tiber in the United States. Under the theory, subsequent delivery abroad effected a proscribed transfer.
 
 
 42
 This argument, even if sound as a legal proposition, does not assist the Liquidator. It would establish only that the checks constituted a United States asset prior to transfer, not that the party that made the transfer was bound by the consent order or that any party that was bound wrongfully directed the payment in a way that would expose the transferor to liability as an aider and abettor.
 
 
 43
 Moreover, the proposition is at best weak under New York law, which (the parties agree) controls the controversy. "[A] check has no valid inception until delivery." New York v. Barclays Bank, 563 N.E.2d 11, 12 (N.Y. 1990) (holding that a payee has no interest in a check prior to attaining actual or constructive possession); see also Grubb v. Gen. Contract Purchase Corp., 94 F.2d 70,73 (2d Cir. 1938) ("[N]o cheque is valid before delivery.").
 
 
 44
 The Liquidator does not challenge this precedent. Rather, the Liquidator invokes affirmative collateral estoppel, citing a ruling favorable to it in a prior action between DiLoreto and the Liquidator involving a different set of checks, none of which involved Tiber funds. However, "[t]o be bound by a prior judgment, a party in the subsequent litigation must have been a party to, or represented by a privy in, the prior action." Haitian Centers Council, Inc. v. McNary, 969 F.2d 1350, 1355 (2d Cir. 1992) (citing Parklane Hosiery Co. v. Shore, 439 U.S. 322, 327 & n.7 (1979)), rev'd on other grounds, sub nom. Sale v. Haitian Centers Council, Inc., 509 U.S. 155 (1993). Tiber was not represented in the prior suit; nor was Ardra, for that matter, nor were the interests of either company. Without more, there is insufficient evidence of privity in the record. See 18 Wright, Miller & Cooper, Federal Practice and Procedure, § 4460 at 533 ("Corporations are treated as entities separate from their officers, directors, and shareholders for purposes of preclusion....").
 
 
 45
 In any event, this Court, sitting in diversity, must follow the holdings of the New York Court of Appeals and must reject inconsistent rulings from its lower courts. First Investors Corp. v. Liberty Mut. Ins. Co., 152 F.3d 162, 165 (2d Cir. 1998). In other and more compelling circumstances, we might pursue the estoppel inquiry further, but on this pure question of law, we will follow the applicable rule announced by the New York Court of Appeals in Barclays Bank. See Haitian Centers Council, 969 F.2d at 1356 ("Especially where pure questions of law are presented, courts and commentators both have recognized that the interests of finality and judicial economy may be outweighed by other substantive policies....").
 
 Conclusion
 
 46
 For these reasons the contempt order is vacated and the matter is remanded for any further proceedings.