Paul **DEBARY** and Joseph Bernstein, **Individually in Their Capacities as Litigation Trustees of the Catskill Litigation Trust, Plaintiffs,**

v.

**HARRAH'S OPERATING COMPANY, INC. Defendant.**

**Monticello Raceway Development Company, LLC Plaintiff,**

v.

**Park Place Entertainment Corporation, Defendant.**

**No. 06 CIV. 6365(CM).**

United States District Court, S.D. New York.

Nov. 20, 2006.

John P. Gallagher, Stephen F. Harmon, William W. Hopson, Troutman Sanders, LLP, Atlanta, GA, Sanford Ian Weisburst, Quinn Emanuel Urquhart Oliver & Hedges LLP, New York City, for Plaintiffs.

Paul R. Verkuil, Boies, Schiller & Flexner, LLP, New York City, for Defendant.

## DECISION AND ORDER ON REMAND FROM THE SECOND CIRCUIT, REINSTATING THIS COURT'S PRIOR JUDGMENT GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

MCMAHON, District Judge.

Catskill Development, L.L.C. ("Catskill"), Mohawk Management, L.L.C. ("Mohawk") and Monticello Raceway De-

velopment Co., L.L.C. ("Monticello") (collectively, "Original Plaintiffs"), originally brought this action in diversity against Park Place Entertainment Corp. ("Park Place"), alleging that defendant, one of the world's largest casino companies, wrongfully induced officials of the St. Regis Mohawk Indian Nation ("Tribe") to terminate the Tribe's contractual agreements and business relationships with plaintiffs relating to the development and management of a proposed $500 million Native American casino at the Monticello Raceway in Sullivan County, New York (the "Casino Project"). Plaintiffs sought damages based on defendant's alleged tortious interference with contractual relations, tortious interference with prospective business advantage, unfair competition, and Donnelly Act violations.

Following this court's dismissal of plaintiffs' unfair competition and Donnelly Act claims in *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 144 F.Supp.2d 215 (S.D.N.Y.2001) ("*Catskill I*") and granting of defendant's motion of summary judgment on the two remaining claims in *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 217 F.Supp.2d 423 (S.D.N.Y.2002) ("*Catskill III*"), plaintiffs appealed to the Second Circuit.

The Second Circuit remanded this case so that this court could determine whether federal jurisdiction properly existed if non-diverse parties Catskill and Mohawk were dismissed, whether the remaining plaintiff—Monticello—was a third-party beneficiary to the Land Purchase Agreement, and, if so, whether New York law permitted third-party beneficiaries to recover damages for defendant's alleged tortious interference with contract.

For the reasons stated below, this court finds that it has subject matter jurisdiction over this case now that the non-diverse parties have been dismissed. While New York law permits recovery by third-party beneficiaries for tortious interference with contract, Monticello is not a third-party beneficiary of the LPA.

This court's prior decision granting defendant summary judgment and dismissing the case in its entirety, is reinstated.

## I. *The Relevant and Undisputed Facts*

The factual background to the dispute between the parties is set forth in greater detail in this court's earlier opinions. *See, e.g., Catskill III*, 217 F.Supp.2d at 425–28; *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 154 F.Supp.2d 696, 698–701 (S.D.N.Y.2001) ("*Catskill II*"); *Catskill I*, 144 F.Supp.2d at 218–229. This court assumes familiarity with these opinions.

Briefly, the original plaintiffs are entities created by a group of businessmen and developers who, beginning in 1995, sought to build and operate a casino at a site adjacent to the Monticello Racetrack in Monticello, New York. Because gambling activities are illegal in New York State unless conducted on Native American lands, under certain legal conditions, plaintiffs partnered with the Tribe to pursue development of the Casino Project.

On June 3, 1996, original plaintiff Catskill acquired, from entities that are not parties or in any way connected to the Tribe, 230 acres of land that contained the Monticello Raceway. Of the property purchased, 29.31 acres adjacent to the Raceway (the "Raceway property") were set aside for the Casino Project. Catskill created the other two original plaintiffs, Mohawk and Monticello, to provide various services for the Raceway and the casino; Catskill entered into an agreement with the latter which granted Monticello " the exclusive right to develop, lease and manage" the entire 230 acre tract. (*See* Declaration of Sanford I. Weisburst ("Weisburst Decl."), Ex. T at 1.) Catskill acted for all three entities in seeking the local, state

and federal endorsements necessary to build and operate the proposed casino.

On July 31, 1996, the Tribe and plaintiffs entered into five separate agreements: the Land Purchase Agreement (the "LPA"), the Gaming Facility Development and Construction Agreement (the "DCA"), the Gaming Facility Management Agreement (the "Management Agreement"), the Shared Facilities Agreement (the "SFA"), and the Mortgage Agreement.[1]

### A. The Land Purchase Agreement

The LPA, which is the focus of this remand, was an agreement between Catskill and the St. Regis Mohawk Gaming Authority (the "Authority"), "an instrumentality of the Tribe, to which it has assigned its authority over the development and conduct of Gaming ... on the Property." (Weisburst Decl., Ex. I, Recitals.) The express purpose of the LPA was to convey the Raceway property from Catskill to the United States Government, to be held in trust for the Tribe. The LPA stated that the Tribe intends to "use the Real Estate to improve the economic conditions of its members ... and directly benefit the Tribe." (Weisburst Decl., Ex. H, Recitals.) In exchange for the trust conveyance, the Tribe agreed to pay Catskill $10 million, which was the price Catskill had paid to the prior owners in order to acquire the entire 230 acre tract. (*Id.* at § 2.02(a).)

Although the primary contractual obligations articulated in Article II of the LPA, entitled "THE TRANSACTION," involved the trust conveyance in exchange for reimbursement of the purchase price explained above, Article II also required the Authority to "perform certain covenants as provided herein." (*Id.* at § 2.02(b).) These covenants, enumerated in Article VIII of the LPA, included the following:

> Section 8.02. *BIA Approval.* The Authority shall (and shall cause the Tribe to) cooperate with Seller [Catskill] and any of its Affiliates and use Authority's reasonable best efforts in good faith to assist in obtaining the approval of the [Bureau of Indian Affairs ("B.I.A.")] of the Trust Conveyance and any other documents or transactions related thereto....

> Section 8.04. *Use of Proceeds.* The Authority shall use the net proceeds from the sale of the Senior Secured Notes[2] only for the acquisition, construction, development and operation of the Project....

(*Id.* at §§ 8.02 and 8.04.) § 1.01, in turn, defined an "Affiliate" of any specified person in the LPA as

> any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.... "[C]ontrol" ... shall mean the possession, directly

---

**1.** On the same day that the Tribe entered into these five agreements, the St. Regis Tribal Council passed a resolution stating that the Tribe "has taken steps to acquire land on which a gaming facility will be developed in Sullivan County, New York," and specifically resolving to "authorize the Chief Executive Officer to execute the Gaming Facility Management Agreement with Mohawk ... the Development and Construction Agreement with Monticello ... and all other collateral agreements necessary to further this development." (Weisburst Decl., Ex.Q.)

**2.** "Senior Secured Notes" was not defined in the LPA, but was defined in the DCA and MA as "the Authority's Series A Senior Secured Notes and Series B Senior Secured Notes, if any, issued by the Authority pursuant to the Indenture." (Weisburst Decl., Ex. I at § 1.1; Ex. J at § 2.) The "Senior Secured Note Indenture," in turn, was defined as "that certain Indenture, dated as of the Issuance Date, by and among the Authority, the Tribe and the Trustee, pursuant to which the Senior Secured Notes are issued." (*Id.*)

or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise. . . .

(*Id.* at § 1.01.)

The LPA also outlined the available remedies in case of contractual default, specifying that if the Authority breached its obligations under the LPA, Catskill's "sole remedy shall be to seek specific performance by [the Authority] of its obligations under this Agreement." (*Id.* at § 12.01.) However, in a later provision, the LPA also stated that the Authority "does hereby waive its sovereign immunity from unconsented suit, whether such suit be brought in law or equity. . . . [The Authority] intends this waiver to be interpreted liberally to permit the full litigation of disputes arising under or out of this Agreement." (*Id.* at § 14.10.)

Finally, the LPA contained an integration clause that stated, "This Agreement contains the entire understanding between the parties with respect to the subject matter hereof." (*Id.* at § 14.03.) Although the "definitions" section of the LPA stated that " 'Developer' means Monticello Raceway Development Company, L.L.C." (*id.* at § 1.01), neither the word "Developer" nor the name "Monticello" appeared again anywhere in the LPA. Similarly, the LPA mentioned the DCA once in its "definitions" section, but never again.

## B. The Gaming Facility Development and Construction Agreement

The DCA, meanwhile, was an agreement between the Tribe and Gaming Authority on one side, and Monticello on the other, in which the Tribe granted Monticello the right to plan and to build the casino. In exchange, Monticello was to receive compensation from the Authority and agreed to help the Tribe obtain financing for the construction.

The parties' obligations under the DCA were clearly defined. The DCA set forth the fee to be paid by the Authority to Monticello for its development of the Casino: "As compensation for all of the services to be performed . . . by [Monticello], the Authority agrees to pay to [Monticello] and [Monticello] agrees to accept payment for the performance of its services under this Agreement, a developer's fee . . . equal to five percent . . . of total Project Costs." (*Id.* at § 5.3.) The DCA also contained a clause requiring both Monticello and the Authority "to execute . . . any and all additional instruments . . . and other documents as may be required by the . . . Bureau of Indian Affairs . . . in order to effectuate . . . the respective rights . . . of the parties hereto." (*Id.* at § 8.1.)

The DCA did not mention the LPA except in the "definitions" section. Notably, in defining the LPA, the DCA made no mention of any third-party beneficiary: the LPA "shall mean that certain Agreement . . . between the Catskill Development, L.L.C. and the Authority, pursuant to which Catskill . . . shall convey the Property to the United States to be held in trust for the benefit of the Tribe." (Weisburst Decl., Ex. I at § 1.1.) The only other hint of the LPA's existence occurred in the DCA Recitals, which noted, "The Tribe is expected to be the beneficial owner of certain land located in the State of New York . . . . to be held in trust for the benefit of the Tribe by the United States of America." (*Id.* at Recitals ¶ A.)

Last, like the LPA, the DCA contained an integration clause: "This Agreement, *and the Management Agreement* . . . constitute the entire agreement among [Monticello, the Authority and the Tribe] with respect to the development, construction and management of the Gaming Facility." (*Id.* at § 8.14) (emphasis added). The LPA was not integrated into the DCA. The

DCA further stated, "Neither [Monticello nor the Authority] shall have the power to bind or obligate the other except as set forth in this Agreement." (*Id.* at § 8.4.)

Unlike the LPA, the DCA contained a third-party beneficiary clause, expressly stating that the DCA was not intended to directly benefit anyone other than the parties thereto. (*Id.* at § 8.2.)

### C. The Master Amendment

Almost four years after executing the five agreements, on March 22, 2000, the various parties thereto executed a Master Amendment in response to the Secretary of the Interior's request "that the parties explain, clarify, or make certain amendments to the agreements before he makes the two-part determination required by Section 20, 25 U.S.C. § 2719(b)(1)(A)."[3] (Weisburst Decl., Ex. U, Recitals.) Specifically, the Master Amendment amended four of the five agreements originally signed by the parties. The Master Amendment's primary purpose was to add a clause to the DCA, SFA, and Management Agreement that prohibited Mohawk and Catskill from "establish[ing], own[ing], operat[ing] or manag[ing] any other gaming facility in Sullivan County (other than the Monticello Raceway) without the written consent of the Authority." (*Id.* at ¶¶ 1, 2(I), 3(ii).) The Master Amendment also amended the DCA to include the provision that, "Upon termination of this Agreement, [Monticello] has no ongoing role in the Gaming Facility." (*Id.* at ¶ 2(iv).)

The LPA was the only agreement not amended by the Master Amendment.

### D. The Lawsuit

Although plaintiffs and the Tribe began in 1996 to seek the regulatory approvals required to begin the Casino Project, plaintiffs still had not received all the necessary regulatory approval to move forward by April 2000. They had, however, expended millions of dollars toward their goal.

Sometime in late 1999, Park Place principals were introduced to members of the Tribe. On April 14, 2000, the Tribe entered into a written agreement with Park Place that gave Park Place the exclusive right to develop and manage any and all St. Regis Mohawk casinos in New York State. The execution of the April 2000 agreement with Park Place effectively terminated the Tribe's partnership with plaintiffs and led to this long-running litigation, in which plaintiffs seek damages from Park Place for interfering with their relationship with the Tribe.

## II. Procedural History

### A. Catskill I

On November 13, 2000, plaintiffs filed their complaint, alleging four causes of action. This Court granted defendant's motion to dismiss plaintiffs' First Cause of Action (alleging tortious interference with contractual relations) and their Third and Fourth Causes of Action (claiming unfair competition and violation of the Donnelly Act). *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 144 F.Supp.2d 215 (S.D.N.Y. 2001) ("*Catskill I*"). Plaintiffs' Second Cause of Action, for tortious interference with prospective business advantage, survived defendant's motion to dismiss. In

---

**3.** 25 U.S.C. § 2719(b)(1)(A) permits gaming on land held by the U.S. government in trust for Indian tribes, only if the Secretary of the Interior "determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community," and "if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination."

dismissing the First Cause of Action pursuant to Fed.R.Civ.P. 12(b)(6), I held that the Management Agreement was void under 25 U.S.C. § 2711(b) which requires that any management contract be approved by the Chairman of the National Indian Gaming Commission ("NIGC") in order to be an enforceable contract. *Catskill I*, 144 F.Supp.2d at 232. I then held that the other four agreements between plaintiffs and the Tribe—the LPA, the DCA, the SFA and the Mortgage Agreement—were "collateral" to the Management Agreement within the meaning of the Indian Gaming Regulatory Act ("IGRA"), 25 § 2711(a)(3), and so were also void because they lacked NIGC approval. *Id.* at 233.

## B. Catskill II

Upon Plaintiffs' timely motion for reconsideration, plaintiffs persuaded this court that § 2711(a)(3) applies only to management contracts for Class II gaming. Under the Management Agreement, the Tribe took full responsibility for Class II gaming. Plaintiffs argued that, since the Management Agreement addressed only Class III gaming, the "collateral agreement" rule of Section 2711(a)(3) did not apply to the LPA, the DCA, the SFA or the Mortgage Agreement.

I agreed, concluding that the term "management contract," as used in Section 2710(d)(9) (relating to Class III Gaming), did not include collateral agreements that relate to the gaming activity. I vacated so much of *Catskill I* as had voided the four collateral agreements in reliance on Section 2711(a)(3). Because I had concluded in *Catskill I* that three of the four collateral agreements—the DCA, the SFA, and the Mortgage Agreement—were invalid on separate grounds, I did not reverse the dismissal of claims relating to them. But since there was no basis other than the "collateral agreement" theory of Section 2711(a)(3) for invalidating the LPA, I rein-

stated plaintiffs' First Cause of Action for tortious interference with contract, insofar as it related to the LPA. *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 154 F.Supp.2d 696 (S.D.N.Y.2001) ("*Catskill II*").

## C. Catskill III

Following the *Catskill II* decision, defendant sought reconsideration of that ruling. Defendant argued that the Eighth Circuit's holding in *U.S. v. Casino Magic Corp.*, 293 F.3d 419 (8th Cir.2002) rendered the holding in *Catskill II* questionable. Defendant simultaneously moved for summary judgment on plaintiffs' First and Second Causes of Action.

After concluding that *Casino Magic* "neither explains nor fills in the statutory gap identified in *Catskill II*," this court found what I still believe to be the answer in the Code of Federal Regulations:

> The NIGC's rules, codified at Chapter 25, Title III of the Code of Federal Regulations, require agency review of management contracts for both Class II and Class III gaming. 25 C.F.R. § 533.1. According to these duly-promulgated regulations, a "management contract" is defined as "any contract, subcontract, *or collateral agreement* between an Indian tribe and a contractor...." 25 C.F.R. § 502.15 (emphasis added). A collateral agreement, as defined by the NIGC, is "any contract ... that is related, either directly or indirectly, to a management contract, or to any rights, duties or obligations created between a tribe ... and a management contractor...." 25 C.F.R. § 502.5. The LPA fits squarely into the NIGC's definition of an agreement collateral to the management agreement.... Thus, the NIGC has regulatory authority to review and approve the LPA as a collateral agreement, despite the omission of

any reference to Class III management contracts in Section 2711(a)(3), or to Section 2711(a)(3) in Section 2710(d)(9)....

*Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 217 F.Supp.2d 423, 433 (S.D.N.Y. 2002) ("*Catskill III*") (emphasis added).

Because the court had previously found that the LPA fit the NIGC's definition of a collateral agreement to the MA,[4] *Catskill III* held that the LPA was void for want of NIGC approval. For that reason, I granted Park Place's motion for summary judgment dismissing the First Cause of Action. *Catskill III*, 217 F.Supp.2d at 433.

In a separate discussion, *Catskill III* also granted defendant's motion for summary judgment on plaintiffs' sole remaining claim for tortious interference with business advantage. *Id.* at 434–46.

Plaintiffs subsequently asked this court to vacate its decision granting defendant's motion for summary judgment on the tortious interference with business advantage claim, on the ground that defendants had concealed relevant evidence. At the time plaintiffs made their motion, the case was on appeal to the Second Circuit. I asked the Circuit to send the case back for additional discovery, *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 286 F.Supp.2d 309 (S.D.N.Y.2003), and it did so. Although I granted plaintiffs' motion pending additional discovery, I ultimately reinstated the order granting defendant's motion for summary judgment and dismissing the complaint in its entirety. *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 345 F.Supp.2d 360 (S.D.N.Y.2004). Plaintiffs then reinstated their appeal.

### D. The Second Circuit Appeal

On appeal, a jurisdictional defect emerged for the first time. When "plaintiffs filed the complaint, they were unaware of this Court's decision in *Handelsman v. Bedford Village Associates Limited Partnership*, 213 F.3d 48 (2d Cir.2000), stating that the citizenship of a limited liability corporation is determined by reference to the citizenship of its members." *Catskill Litig. Trust v. Park Place Entm't Corp.*, 169 Fed.Appx. 658, 659 (2d Cir.2006). As the court noted, under *Handelsman*, two of the original plaintiffs, Catskill and Mohawk, were not completely diverse from Park Place. Absent complete diversity, federal jurisdiction did not exist under 28 U.S.C. § 1332. *Id.*

Plaintiffs urged the Second Circuit to retain jurisdiction by dismissing the non-diverse plaintiffs pursuant to Fed.R.Civ.P. 21. However, the Second Circuit preferred to remand the case to this court and directed me to determine whether such dismissal would salvage jurisdiction. *Id.* at 660. The Circuit adopted this tactic for several reasons. First, it was "not clear that dismissal of Catskill and Mohawk would cure the jurisdictional defect" because plaintiffs had "made no representation as to the citizenship of Monticello's members when the suit was filed in November 2000." *Id.* In addition, the Circuit thought the district court would be in a better position to determine whether dismissal of Catskill and Mohawk would prejudice any of the parties. *Id.*

The Second Circuit also noted that if Catskill and Mohawk were dismissed from the litigation, then the only remaining plaintiff would be Monticello—a party to

---

4. *See Catskill I,* 144 F.Supp.2d at 233 ("The Land Purchase and Mortgage Agreements effect the transfer and lease of the Raceway property for the purpose of building and oper-ating the casino. Catskill will be paid for this transfer by profits from the casino, which, under the Management Agreement, Catskill will operate.").

only one of the three contracts on which the original tortious interference with contract claim was based, and not a party to the LPA. However, plaintiffs argued that the entire dispute could still be considered by the Circuit, because "Monticello is a third-party beneficiary of the [LPA] signed by Catskill." *Id.* Because Monticello's status as a "third-party beneficiary of the [LPA] is a fact-intensive inquiry that this Court is ill-equipped to undertake, particularly without the aid of the district court's prior consideration of the issue," remand was deemed appropriate. *Id.*

Finally, the Circuit directed this court to determine whether New York law permits third-party beneficiaries of a contract to recover damages for tortious interference with that contract.

To recap, the Second Circuit remanded this case to answer five separate questions: 1) whether dismissal of Catskill and Mohawk as non-diverse parties would prejudice any of the parties in the litigation; 2) whether diversity jurisdiction existed at the time the action was commenced, if Monticello and Park Place are the only remaining parties; 3) whether Monticello was a third-party beneficiary of the LPA; 4) whether New York law permits a third-party beneficiary of a contract to recover damages for tortious interference with that contract; and 5) whether, in light of all these considerations, this court should reinstate part or all of its prior judgment granting defendant's motion for summary judgment and dismissing the case in its entirety. *Id.* at 660–61.

### E. The May 30, 2006 Stipulation

By the time the case returned to this court, none of the original parties was still in existence. Several years after filing the complaint, all three original plaintiffs had assigned their interests in this litigation to an entity known as the Catskill Litigation Trust ("the Trust"). This court had added the Trust as a party plaintiff on February 23, 2004. Meanwhile, Park Place had been acquired by Harrah's Operating Company, Inc. ("Harrah's").[5]

On May 30, 2006, shortly after the Second Circuit issued its remand order, all parties to this litigation, as well as Paul deBary and Joseph Bernstein, as Litigation Trustees of Catskill Litigation Trust (the "Litigation Trustees"), and Harrah's, stipulated, *inter alia,* to the following:

> Plaintiffs and Defendant, agreeing that the prerequisites to dismissal of non-diverse plaintiffs Catskill and Mohawk are satisfied, will promptly join in requesting that the District Court enter an order dismissing Catskill and Mohawk without prejudice. While the Trust's citizenship is irrelevant to determining the existence of diversity since it was added as a Plaintiff after the filing of the original complaint, the parties will request that it too be dismissed without prejudice. Each of the to-be-dismissed plaintiffs in turn agrees that ... it will be bound by the decisions and judgments entered in this case.

(*See* Weisburst Decl., Ex. B ¶ 3) (internal citations omitted).

The stipulation further provided that, once this court dismissed Catskill, Mohawk and the Trust, Paul deBary and Joseph Bernstein would file suit in their own names as Litigation Trustees against Harrah's, in the Southern District of New York. (*Id.* at ¶ 5.) The Litigation Trustees agreed that prior rulings in the original lawsuit would be binding on them in this subsequent lawsuit. (*Id.* at ¶ 7.) In turn, Harrah's agreed not to interpose any ob-

---

5. Park Place changed its name to Caesar's Entertainment, Inc. and subsequently merged into Harrah's effective June 13, 2005. Har-rah's owns the assets that belonged to Caesar's Entertainment prior to the merger. (*See* Weisburst Decl., Ex. B ¶ 2.)

jections to the appropriateness of this action, including objections based on subject matter jurisdiction, personal jurisdiction, improper venue, res judicata, or statute of limitations (*id.* at ¶ 6.), and both parties would request that this court consolidate this new lawsuit with Case No. 00–CV–8660, pursuant to Fed.R.Civ.P. 42(a), and enter a final judgment in the consolidated action based upon the prior decisions in Case No. 00–CV–8660. (*Id.* at ¶¶ 8–9.)

### F.   The June 12, 2006 Order

On June 12, 2006, I signed an order dismissing Catskill, Mohawk, and the Trust from this action without prejudice. June 12, 2006 Order. In reaching this decision, I found that the parties remaining in the action—plaintiff Monticello and defendant Park Place—were completely diverse at the time the complaint was originally filed: Monticello was a citizen of New York, Connecticut and Illinois and Park Place was a citizen of New Jersey and Delaware. (*See* Weisburst Decl., Exs. C–D; *see also id.,* Ex. E at ¶ 11a.) This finding of diversity accords with the Second Circuit's decision in *Handelsman v. Bedford Village Assocs. Ltd. P'ship,* which held that the citizenship of a limited liability corporation is determined by reference to the citizenship of its members. 213 F.3d 48, 51–52 (2d Cir.2000).[6]

I further found that the Fed.R.Civ.P. 21 prerequisites to such a dismissal were satisfied. First, I concluded that Catskill and Mohawk were dispensable parties given that complete relief could be accorded between the remaining parties, and because any judgment against Monticello in this action would have preclusive effect against Catskill and Mohawk. (*See* Pl. Mem. of Law at 3.) Also, the May 30, 2006 Stipula-

tion, to which attorneys for Catskill, Mohawk, Monticello, the Trust, the Litigation Trustees, Park Place and Harrah's were signatories, provided sufficient evidence that no party to this litigation would "suffer prejudice by virtue of the dismissal." *Newman–Green v. Alfonzo–Larrain,* 490 U.S. 826, 832, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989). (*See also* Pl. Mem. of Law at 3–4 for explanation of why none of the parties felt prejudiced by May 30, 2006 Stipulation.)

### G.   Consolidation of the Two Actions

Subsequent to this Court's order, the plaintiff Litigation Trustees filed their complaint on August 22, 2006. Case No. 06–CV–6365. On October 6, 2006, after deciding that the two cases involve "common question[s] of law [and] fact," I ordered Case No. 06–CV–6365 and Case No. 00–CV–8660 to be consolidated pursuant to Fed.R.Civ.P. 42(a). Defendant Harrah's joined the litigation shortly after, filing its Answer on October 25, 2006.

The Stipulation and the above-described orders dispensed of the jurisdictional problem. I now turn to the rest of the Second Circuit's questions.

### III.   *Discussion*

### A.   *Standard of Review*

This case has been remanded by the Second Circuit from an appeal of this court's decision granting defendant's motion for summary judgment on claims for tortious interference with contract and tortious interference with business advantage. Therefore, in determining whether Monticello is a third-party beneficiary of the LPA, this court views the record in the light most favorable to the plaintiffs and

---

**6.** In addition, the plaintiffs in the consolidated action, Paul deBary and Joseph Bernstein, are domiciled in Connecticut and Florida, respectively, and are therefore completely diverse from Harrah's, a Delaware corporation with a principal place of business in Nevada. (*See* Weisburst Decl., Ex. B ¶ 6, Exs. F–G.)

resolves all ambiguities and draws all reasonable inferences against the defendant. *See Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Donahue v. Windsor Locks Bd. of Fire Commn'rs*, 834 F.2d 54, 57 (2d Cir.1987).

### B. Monticello is Not a Third–Party Beneficiary to the LPA [7]

#### 1. Whether Monticello is a Third–Party Beneficiary is a Question of Fact Properly Addressed by this Court

■ Before addressing the substance of plaintiffs' claim that Monticello is a third-party beneficiary to the LPA, two procedural issues warrant comment.

First, I concur with plaintiffs' statement that third-party beneficiary status is a question of fact, because the issue turns on whether the contracting parties intended their agreement to directly benefit a third-party. (Pl. Reply Mem. of Law at 2.) Determining intent is necessarily a factual endeavor. *See Oost–Lievense v. N. Am. Consortium, P.C.*, 969 F.Supp. 874, 879 (S.D.N.Y.1997).

However, I disagree with plaintiffs' suggestion that the only way to resolve that issue of fact is by trial. (Pl. Reply Mem. of Law at 2.) The parties' intent can and should be gleaned from the four corners of the resulting contract; indeed, the primary purpose of reducing an agreement to writing is to fully and completely state the parties intentions regarding their transaction. Only if the contract is ambiguous on its face would courts consider parol evidence. *Finch. Pruyn & Co., Inc. v. M.*

*Wilson Control Servs.*, 239 A.D.2d 814, 658 N.Y.S.2d 496, 499 (3d Dep't 1997). Because I conclude that the LPA is not ambiguous, there is no disputed issue of fact to resolve at a trial.

#### 2. Plaintiffs are Not Judicially Estopped from Claiming that Monticello is a Third–Party Beneficiary to the LPA

■ Defendant suggests in its opening brief that plaintiffs are judicially estopped from claiming third-party beneficiary status for Monticello because plaintiffs argued the following in a 2001 brief requesting this court to reconsider its dismissal order in *Catskill I*: "Catskill, Mohawk and Monticello were to be separately compensated for their property or services under their respective agreements .... *Neither Catskill, Mohawk nor Monticello had any rights or obligations or were to receive compensation under more than one of these agreements.*" (Declaration of George F. Carpinello ("Carpinello Decl."), Ex. A at 5) (emphasis in original.)

■ As defendant conceded in its reply brief (Def. Reply Mem. at 2), that argument fails. A party may be judicially estopped "from asserting a factual position in a legal proceeding that is contrary to a position previously taken by him in a prior legal proceeding" provided the party actually "argued an inconsistent factual position in a prior proceeding" and "the prior inconsistent position [was] adopted in some manner by the court in the earlier proceeding." *Mademoiselle Knitwear, Inc. v. Liz Claiborne, Inc.*, No. 98 CV 3252, 1999 WL 377853, at *9 (S.D.N.Y. June 9, 1999).

---

7. Although the Second Circuit asked this court to consider only whether Monticello is a third-party beneficiary to the LPA, plaintiffs suggests that "judicial economy favors addressing Mohawk as well because the inquiry is so similar and because it will have to be undertaken if the Second Circuit holds valid the LPA but not the [Management Agree- ment]." (Pl. Mem. of Law at 8 n. 5.) While I agree that an inquiry regarding Monticello's third-party beneficiary status is essentially identical to an analysis of Mohawk's status, Mohawk has been dismissed from this case as a non-diverse party. Therefore any inquiry into its rights under the LPA would violate the case or controversy rule.

Catskill's earlier argument was made in the current proceeding, and that argument did not ultimately prevail. Thus, Catskill is not estopped from claiming that Monticello is a third-party beneficiary to the LPA.

As to defendant's assertion that plaintiffs' current posture "is disingenuous since it is flatly inconsistent with the strenuous arguments made by its co-plaintiff in previous filings to this Court" (Def. Reply Mem. at 2), I would note only that, since there is no judicial estoppel, plaintiffs are free to make any argument they like.

### 3. New York Law Permits a Third–Party Beneficiary to Recover Damages for Tortious Interference with Contract

■ As discussed below, Monticello is not a third-party beneficiary to the LPA and cannot recover for tortious interference with the LPA in any event. However, it bears noting that New York state courts have long held that third-party beneficiaries of a contract may bring a claim for tortious interference with that contract. See, e.g., Associated Flour Haulers & Warehousemen, Inc. v. Hoffman, 282 N.Y. 173, 181, 26 N.E.2d 7 (N.Y.1940) (dismissing claim for tortious interferences where plaintiff failed "to qualify itself either as a party to or a third party beneficiary of" the contract at issue); SageGroupAssocs., Inc. v. Dominion Textile (USA), Inc., 244 A.D.2d 281, 665 N.Y.S.2d 407, 408 (1st Dep't 1997) ("The broker's cause of action against the landlord for tortious interference with contract was properly dismissed on the ground that the broker was neither a party to nor an intended beneficiary of the sublease rejected by the landlord"); Scheckter v. Emigrant Sav. Bank, 237 A.D.2d 273, 654 N.Y.S.2d 162, 163 (2d Dep't 1997) (affirming dismissal of tortious interference claim in part because plaintiff was not a third-party beneficiary of the contract); Burba v. Rochester Gas & Elec. Corp., 90 A.D.2d 984, 456 N.Y.S.2d 578, 580 (4th Dep't 1982) ("rejecting defendant's principal contention ... that the complaint [for tortious interference with contract] fails to allege that defendant has breached any contract to which the male plaintiffs were parties," reasoning that plaintiffs "have alleged that they were third-party beneficiaries of" the contracts at issue); see also 72 N.Y. JUR. 2D INTERFERENCE § 17 ("As a general rule, one may not maintain an action for inducing breach of contract unless he or she is a party to the contract or a third-party beneficiary thereunder") (citing Hoffman, 282 N.Y. at 181, 26 N.E.2d 7).

Federal district courts applying New York law have reached the same conclusion. See, e.g., Am Online Latino v. Am. Online, Inc., 250 F.Supp.2d 351, 363 n. 65 (S.D.N.Y.2003) ("Plaintiff may not sue for inducing breach of such a contract unless he is its third party beneficiary."); Arista Records, Inc. v. Mp3Board, Inc., No. 00–CV–4660, 2002 WL 1997918, at *16 (S.D.N.Y. Aug. 29, 2002) (denying defendant's motion for summary judgment on plaintiff's claim for tortious interference with contract even though plaintiff was not a party to the contract because "there is evidence that the contract or a later modification of it was made expressly for [plaintiff's] benefit" such that plaintiff "could enforce [the contract] as a third party beneficiary"); Wells Fargo Bank N.W., N.A. v. Energy Ammonia Transp. Corp., No. 01–CV–5861, 2002 WL 1343757, at *1 (S.D.N.Y. June 18, 2002) ("Since ... defendants are neither parties to, nor third-party beneficiaries of [the contract] they lack standing to bring a claim for tortious interference with that contract.").

### 4. Monticello is Not an Intended Third–Party Beneficiary of the LPA

■ Turning to the substance of plaintiffs' claim, it is evident from the face of

the LPA itself that Monticello is not a third-party beneficiary to that contract.

■ Under New York law, in order to recover as a third-party beneficiary of a contract, a claimant must establish that the parties to the contract intended to confer a benefit on the third party. *Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 124 (2d Cir.2005). The New York Court of Appeals has declared Restatement (2d) of Contracts § 302 to be an accurate statement of New York third-party-beneficiary law. *Id.* (citing *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 66 N.Y.2d 38, 495 N.Y.S.2d 1, 485 N.E.2d 208 (N.Y.1985)). Under section 302(1):

> Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
>
> (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
>
> (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

A contractual requirement that the promisor render performance directly to the third party shows an intent to benefit the third party. *See Levin v. Tiber Holding Corp.*, 277 F.3d 243, 249 (2d Cir.2002) (finding an intended third-party beneficiary where the third-party was a direct beneficiary of the promisor's promise and where performance of the promisor's obligations was rendered directly to the third-party).

This court recognizes, "There is considerable dispute concerning whether it is appropriate to consider extrinsic evidence" regarding third-party beneficiary status. *Piccoli A/S v. Calvin Klein Jeanswear Co.*, 19 F.Supp.2d 157, 164 (S.D.N.Y.1998); *compare Subaru Distribs. Corp.*, 425 F.3d at 124 ("'A court in determining the parties' intention should consider the circumstances surrounding the transaction as well as the actual language of the contract.'") (quoting Restatement (2d) of Contracts § 302, Reporter's Note, comment a) *with Newman & Schwartz v. Asplundh Tree Expert Co., Inc.*, 102 F.3d 660, 663 (2d Cir.1996) ("'Although a third party need not be specifically mentioned in the contact before third-party beneficiary status is found, New York law requires that the parties' intent to benefit a third party must be shown on the face of the agreement.'") (quoting *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 725 F.Supp. 712, 733 (S.D.N.Y.1989)).

■ This court, relying on *Newman & Schwartz* (which has not, to my knowledge, been overruled), concludes that the parties' intention "to benefit the third party must appear from the four corners of the instrument. The terms contained in the contract must clearly evince an intention to benefit the third person who seeks the protection of the contractual provisions." *Travelers Indem. Co. of Conn. v. Losco Group, Inc.*, 150 F.Supp.2d 556, 561 (S.D.N.Y.2001); *see also Onanuga v. Pfizer, Inc.*, No. 03–CV–5405, 2003 WL 22670842, at \*5 (S.D.N.Y. Nov. 7, 2003) ("the intention to benefit a third party must be found within the four corners of the contract"); *Piccoli A/S v. Calvin Klein Jeanswear Co.*, 19 F.Supp.2d 157, 163 (S.D.N.Y.1998) ("the parties' intention to benefit the third party nonetheless must be revealed on the face of the agreement.") (internal quotations and citations omitted).

■ Furthermore, in order for a contract to confer enforceable third-party beneficiary rights, "it must appear 'that no one other than the third party can recover if the promisor breaches the contract' or

the contract language should otherwise clearly evidence 'an intent to permit enforcement by the third party.'" *Artwear, Inc. v. Hughes,* 202 A.D.2d 76, 615 N.Y.S.2d 689, 692 (quoting *Fourth Ocean Putnam Corp.,* 66 N.Y.2d at 45, 495 N.Y.S.2d 1, 485 N.E.2d 208); *see also Subaru Distribs. Corp.,* 425 F.3d at 124–25.

Plaintiffs claim that Monticello is an intended third-party beneficiary of the LPA for five reasons. All of them lack merit.

First, plaintiffs argue that the parties' intent to confer a benefit directly on Monticello is evident from the Authority's promise to "cooperate with Seller and any of its Affiliates and use Authority's reasonable best efforts in good faith to assist in obtaining the approval of the B.I.A of the Trust Conveyance and any other documents or transactions related thereto." (Weisburst Decl., Ex. H at § 8.02.) Plaintiffs argue that this covenant requires the Authority to "render performance directly to Monticello," because Monticello is an affiliate of Catskill. (Pl. Mem. of Law at 10.)

Even assuming *arguendo* that Monticello were an affiliate of Catskill, plaintiffs' assertion that the § 8.02 covenant renders Monticello a third-party beneficiary is incorrect. As a matter of common sense, the LPA is quite simply a contract for the conveyance of land. This purpose is evident from the LPA's recitals, which state that the "Seller intends to convey certain land ... to the United States of America to be held in trust for the benefit of the ... Tribe .... [and] the Tribe desires to use the [land] to improve the economic conditions of its members .... and ... the Authority shall pay the purchase price." (Weisburst Decl., Ex. H, Recitals.) The recitals make no mention of the Authority's obligation to cooperate with Catskill's affiliates.

This contractual objective is echoed in Article II of the LPA, entitled "THE TRANSACTION." Article II states that Catskill will convey 29 acres of land to the United States—to be held in trust for the St. Regis Mohawk Tribe—and that the Authority will pay $10 million for this land. (Weisburst Decl., Ex. H at Art. II.) In addition to detailing the trust conveyance and purchase price, Article II states that "Purchaser has agreed to perform certain covenants as provided herein." (Weisburst Decl., Ex. H at § 2.02(b).) But the very fact that these covenants are not even mentioned in the LPA's recitals or explicitly detailed in the "TRANSACTION" section, further signals their ancillary nature. Notwithstanding § 14.06's boilerplate assertion to the contrary, it is entirely appropriate for this court to interpret the obligations contained in the recitals and Article II as the principal purpose of the contract. *See Subaru Distribs. Corp.,* 425 F.3d at 125 (relying in part on "the recital of the purpose of the agreement" in determining whether plaintiff was an intended third-party beneficiary of the contract).

Thus, even if § 8.02 required the Authority to specifically cooperate with Monticello in obtaining BIA approval—which it does not—such cooperation is clearly incidental to the overall import of the LPA and does not confer a direct benefit on Monticello under the LPA. *See Piccoli A/S,* 19 F.Supp.2d at 163 (holding "Cooperation Clause" in contract was not sufficient to show that the [contract] ... clearly evidences an intent to permit enforcement by [plaintiff]) (internal quotations and citations omitted).

Next, plaintiffs argue that the parties' intent to confer a benefit directly on Monticello is clear from the Authority's promise to "use the net proceeds from the sale of the Senior Secured Notes only for the acquisition, construction, development, and operation of the Project and any other use permitted under the Senior Secured Note

Indenture." (Weisburst Decl., Ex. H at § 8.04.) Plaintiffs contend that reading this provision in conjunction with the LPA's designation of Monticello as the "Developer" (*id.* at § 1.01) necessitates a finding that the Authority "must use the funds in part to pay Monticello." (Pl. Mem. of Law at 10.)

Except for its reliance on *Levin*, Plaintiffs cite no law to support its proposition that using the proceeds from the sale of notes (detailed in a separate contract) to pay for the construction, development and operation of a casino (also detailed in separate contracts), renders Monticello a third-party beneficiary under the LPA.

Unfortunately for plaintiffs, the contract at issue in *Levin* is nothing like the LPA. In *Levin*, a holding corporation that owned a reinsurance company contracted to sell the reinsurer to another company. The contract explicitly required the holding corporation to "maintain [the reinsurer's] capital and surplus at no less than $125,000 over a five-year period" and "to pay [the reinsurer's] legal fees and expenses in [the reinsurer's then] existing litigation until December 3, 2005." *Levin*, 277 F.3d at 246–47. In holding the reinsurer to be a third-party beneficiary to the contract, the court found that the contract "specifically included [the reinsurer] as a direct beneficiary of [the holding corporation's] promise" and that the holding corporation "rendered performance of its obligations directly to [the reinsurer]." *Id.* at 249.

Plaintiffs' reliance on *Levin* apparently derives from the fact that the *Levin* contract contemplates the sale of a company (to which a promise to a third-party reinsurer is inextricably bound) and the LPA is a land sale (to which a promise to Monticello is allegedly inextricably bound). But that is where the similarities end. The *Levin* contract specifically identifies the third-party by name and outlines the pre-cise payment terms—including amounts and duration—related to this promise. By contrast, § 8.04 of the LPA neither contemplates any specific benefit for Monticello, nor states the terms for such benefit. Indeed, the plaintiffs' own argument—that the Authority must use the proceeds "in part" to pay Monticello and that "[t]he DCA further explains" how the Authority should make such payments (Pl. Mem. of Law at 10)—demonstrates the incidental nature of this provision. § 8.04 requires the Authority to pay unnamed entities an unknown sum for an unknown duration for undescribed work. The LPA lacks these specifics because they are contained in a separate contract—the DCA—to which Monticello is a party. No separate contracts existed between the reinsurer and the holding company in *Levin*.

Nor does this alleged basis for third-party beneficiary status resemble the more typical scenario in which the underlying contract exists so that performance can be rendered directly to third-parties. *See, e.g., Flickinger v. Harold C. Brown & Co., Inc.*, 947 F.2d 595, 597, 600 (2d Cir.1991) (holding plaintiff client was third-party beneficiary to contract between his stock broker and brokerage firm, under which brokerage firm provided clearing services for broker's clients, including "register[ing] the securities in [plaintiff's] name and ... ship[ping] the securities to the [plaintiff]" and "sen[ding] periodic activity statements to [plaintiff]"); *Finch*, 658 N.Y.S.2d at 497–98 (holding plaintiff manufacturer who hired electrician to perform services at plaintiff's power plant was third-party beneficiary to subcontract between electrician and mason, because subcontract necessarily required [mason] to "directly perform services at plaintiff's facility ... in order to satisfy ... obligations to plaintiff."). The Authority manifestly signed the LPA to "improve the economic conditions of [the Tribe's] members," not to directly confer any benefit on Monticello.

Moreover, to the extent that any benefits may have accrued to Monticello under §§ 8.02 and 8.04 of the LPA, such benefits were clearly incidental to the LPA's primary goal of conveying land to the U.S. government for the Tribe's benefit. *See Mademoiselle Knitwear*, 1999 WL 377853, at *10. In *Mademoiselle Knitwear*, the court held that the plaintiff sweater manufacturer was an incidental beneficiary of contracts between the sweater retailer and the union representing the retailer's apparel workers. The contracts at issue required the retailer to "order from .the plaintiff" an average of 1.4 million sweaters per year, to be "produced by" plaintiff's recently unionized employees; simultaneously, the retailer entered into an oral contract with the manufacturer requiring the retailer to order an average of 1.4 million sweaters per year from plaintiff. *Id.* at *1–2. The court held that "[t]o the extent that the ... agreements may have guaranteed the plaintiff certain levels of production—and perhaps profits—[plaintiff] was no more than an incidental beneficiary of these agreements and has no ability to enforce them." *Id.* at *1–2. Similarly, the benefits allegedly accruing to Monticello under the LPA are actually granted to Monticello via the DCA, a contract to which Monticello is a party. Therefore, to the extent that benefits to Monticello are contemplated by the LPA, they are incidental to the LPA's overall purpose. *See also McPheeters v. McGinn, Smith & Co., Inc.*, 953 F.2d 771, 773 (2d Cir.1992) ("A third-party beneficiary exists, however, only if the parties to that contract intended to confer a benefit on him when contracting; it is not enough that some benefit incidental to the performance of the contract may accrue to him.") (internal quotations and citations omitted).

Third, plaintiffs contend that Monticello should be deemed a third-party beneficiary to the LPA because of "the LPA's frequent mention of Monticello." (Pl. Mem. of Law at 15.) Putting aside the fact that plaintiffs' brief cites six examples of this "frequent mention" and only one of these six cites actually mentions either "Monticello" or "Developer" (Weisburst Decl., Ex. H at § 1.01), this argument is still unpersuasive. If the LPA specifically mentioned Monticello by name one hundred times, that alone would not constitute sufficient evidence that parties to the LPA intended for Monticello to be a third-party beneficiary. Cases relied on by plaintiffs do not hold otherwise. For, example, in *National Westminster Bank plc v. Grant Prideco, Inc.*, the fact that plaintiff was specifically mentioned in the contract was merely one factor that weighed in favor of finding plaintiff to be a third-party beneficiary. Far more persuasive was the contract's "provision specifying [that] payment" be made "directly to [plaintiff]" 261 F.Supp.2d 265, 268, 274 (S.D.N.Y.2003); *see also Septembertide Publ'g, B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 677–80 (2d Cir.1989) (holding author was third-party beneficiary of contract between publisher and sublicensee of publishing rights, where publisher paid author two-thirds of all sublicensing income derived from contract—pursuant to separate agreement—and contract referred to author and his work). In every case cited by plaintiffs, the decisive factor is not whether or how often the contract mentions a third-party,[8]

---

8. Indeed, many courts have recognized that a contract need not specifically name a third-party at all in order to directly benefit a third-party. *See, e.g., Piccoli A/S*, 19 F.Supp.2d at 163 ("a 'party need not necessarily be specifically mentioned in a contract to be considered a third-party beneficiary'") (quoting *Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 663 (2d Cir.1996)).

but whether the contract clearly grants some benefit or performance directly to the third-party.

Fourth, plaintiffs assert that Monticello is a third-party beneficiary to the LPA because the LPA's sovereign immunity waiver provision "plainly contemplates suits by entities other than Catskill against the Authority for money damages." (Pl. Mem. of Law at 17.) Plaintiffs argue that § 14.10's broad immunity waiver which permits the Authority to be sued "in law or equity" must mean that entities other than Catskill can sue the Authority for breaching the LPA, because § 12.01 explicitly states that the only remedy available to Catskill against the Authority is specific performance. (Weisburst Decl., Ex. H at §§ 12.01, 14.10.) According to plaintiffs, § 14.10 clearly contemplates suit, not just by any entity, but by Monticello in particular, given its "frequent mention earlier in the LPA as well as the benefits [it] stood to receive upon the LPA's closing." (Pl. Mem. of Law at 17.)

Neither plaintiffs nor defendant cites any cases that address a similar argument, and this court has been unable to find a case in which dual remedial clauses were deemed evidence that the contracting parties intended to grant some benefit to a third-party. I am, however, convinced that the LPA's remedial provisions do not evince such intent. While § 12.01 makes clear that Catskill may only seek specific performance in the event of the Authority's breach, the leaps of contractual interpretation that plaintiffs then urge this court to make are simply too vast to support a finding that the LPA parties clearly intended to benefit Monticello. Nowhere in §§ 12.01 or 14.10 is either Monticello or the "Developer" actually mentioned, nor do §§ 8.02 and 8.04 confer such obvious benefits on Monticello that the LPA parties "clearly . . . inten[ded] to permit enforcement [of the LPA]" by Monticello.[9] *Artwear, Inc.*, 615 N.Y.S.2d at 692 (internal quotations and citations omitted).

Finally, plaintiffs contend that the circumstances surrounding the execution of the LPA, including the "interrelationship between the LPA," the DCA and the Management Agreement, "overwhelmingly support the conclusion that the parties to the LPA intended to benefit Monticello." (Pl. Mem. of Law at 18.) But as previously noted, the parties' intention "to benefit the third party must appear from the four corners of the instrument. The terms contained in the contract must clearly evince an intention to benefit the third person who seeks the protection of the contractual provisions." *Travelers Indem. Co. of Conn.*, 150 F.Supp.2d at 561. This court will not consider surrounding circumstances when—as here—the intent of the parties is clear on the face of the contract. Aside from containing no provisions that clearly confer any benefit directly on Monticello, the LPA also contains an integration clause that states, "This Agreement contains the entire understanding between the parties with respect to the subject matter hereof." (Weisburst Decl., Ex. H at § 14.03.) It does not say "This Agreement and several other agreements concerning what will happen to the property in the future contain the entire under-

---

**9.** A more accurate reading of these two provisions appears to be that § 12.01 mandates specific performance as the only remedy available to Catskill for the Authority's breach and—given that § 12.01 contains no sovereign immunity waiver itself— § 14.10 provides the necessary (and boilerplate) waiver so that Catskill can in fact seek § 12.01's prescribed remedy. Whether such an interpretation is accurate, or whether these two LPA remedial provisions are—as plaintiffs and defendant respectively assert—collaborative or conflicting, is irrelevant to the instant question. The bottom line is that neither provision contemplates Monticello as a potential claimant.

standing." The LPA stands on its own: the land conveyance is its own separate transaction. Therefore, this court finds that the LPA clearly evidences no intent to benefit Monticello.

Even if this court were to consider circumstances surrounding execution of the LPA, including the interrelationship between these three separate contracts, such interrelationship would not be sufficient to confer third-party beneficiary rights on Monticello in the LPA contract. The DCA's own integration clause—which explicitly defines the limits of Monticello's rights in the Casino Project—persuades this court that Monticello's third-party beneficiary status in the LPA should not hinge on agreements outside of the LPA:

> This [DCA] Agreement, and the Management Agreement, together with the exhibits thereto, constitute the entire agreement among Developer [Monticello], Authority and the Tribe ... with respect to the development, construction and management of the Gaming Facility and supersedes all written or oral agreements, understandings, representations and negotiations and correspondence between the parties. This Agreement shall not be supplemented, amended or modified by any course of dealing, course of performance or uses or trade and may only be amended or modified by a written instrument duly executed by officers of the parties hereto.

(Weisburst Decl., Ex. I at § 8.14) (emphasis added). The DCA's integration clause does not "integrate" the LPA into Monticello's deal, while it does integrate the Management Agreement (a separate contract). This integration clause, coupled with the LPA's equally strong provision, gainsays any attempt by plaintiffs to locate third-party beneficiary rights for Monticello in the LPA.

Moreover, if the existence of the DCA and Management Agreement signals anything to this court, it is that the LPA most certainly did not intend to confer third-party beneficiary rights on Monticello, because Monticello's rights were clearly defined elsewhere. *See 4 Hour Wireless v. Smith,* No. 01–CV–9133, 2002 WL 31654963, at *1 (S.D.N.Y. Nov. 22, 2002) ("The conclusion that Calypso was not an intended third-party beneficiary of the AT & T/4 Hour contract is buttressed by Calypso's own agreement with 4 Hour"); *see also Subaru Distribs. Corp.,* 425 F.3d at 126 (holding that plaintiff sub-distributor lacked third-party beneficiary status under agreement between car manufacturer and car distributor granting distributor exclusive rights in U.S., where plaintiff entered later contract with distributor granting plaintiff sub-distribution rights in New York, contract referenced earlier agreement, but manufacturer was not party to later contract; contract's mere "reference to" agreement "does nothing to establish that the earlier agreement was made for the benefit of [plaintiff]").

The pre-LPA relationship between Catskill and Monticello does not alter this outcome. On December 1, 1995, Catskill and Monticello entered an agreement wherein Catskill granted Monticello the exclusive right to develop Catskill's 230 acre parcel of land at the Monticello Raceway, including the 29 acre tract that later became the subject of the LPA. (Weisburst Decl., Ex. T at 1, 3.) Plaintiffs contend that "[h]aving decided to transfer this 29 acre tract, Catskill had to procure the Tribe/Authority's agreement (consummated in the DCA) to use Monticello as the exclusive developer of the land ... or else Catskill would be in breach of its 1995 agreement with Monticello. Accordingly, it follows that Catskill and the Tribe/Authority, in signing the LPA, intended to benefit Monticello." (Pl. Mem. of Law at 20.)

It most certainly does not. Nowhere in the 1995 agreement does Catskill promise Monticello anything but the exclusive right to develop a 230 acre parcel of land. The 1995 agreement does not mention any duty on the part of Catskill to procure a tribe's agreement to use Monticello as the exclusive developer of the casino; at most, the 1995 agreement suggests potential agreements to come, stating, "That portion of the Property on which the casino will be constructed *may* be conveyed to the [U.S.] to be held in trust for an Indian Nation which *may* operate a Class II and Class III gaming facility." [10] (Weisburst Decl., Ex. T at 1) (emphasis added.) Even if the 1995 agreement could be construed as requiring Catskill to obtain such an agreement—which is a stretch—the 1995 agreement surely did not require Catskill to convey a 29 acre portion of the 230 acre tract to the U.S. government, to be held in trust for an Indian Nation to be named later. Thus, the 1995 agreement stood apart from the LPA, DCA and Management Agreement; Monticello still maintains the exclusive right to develop the 230 acre parcel of land and the enforceability of the other three agreements in no way affects this right.

Similarly, the execution of the Master's Amendment does not provide external evidence that the LPA was intended to directly benefit Monticello. The Master Amendment was executed because "the Secretary [of the Interior] has requested that the parties explain, clarify or make certain amendments to the agreements before he makes the two-part determination

required by Section 20, 25 U.S.C. § 2719(b)(1)(A)." (Weisburst Decl., Ex. S at 1.) Essentially, the Master Amendment modifies the DCA, SFA, and Management Agreement by requiring Mohawk and Catskill to abstain from operating any other gaming facilities in Sullivan County without the Authority's written consent.[11] (*Id.*) As plaintiffs concede, not a single amendment in the Master Amendment affects the LPA; in fact, the Master Amendment does not mention the LPA at all. Moreover, although Monticello clearly "impaired [its] interests under the . . . DCA . . . in the Master Amendment" (Pl. Mem. of Law at 20), it does not follow that Monticello did so because of the "intended benefits under the LPA that . . . Monticello stood to receive." (Pl. Mem. of Law at 19–20.) Monticello agreed to the Master Amendment because doing so was the only way to appease the Secretary, receive the necessary regulatory approval for the Casino Project, and—hopefully—receive benefits specifically earmarked for Monticello in the DCA.

## C. This Court's Earlier Judgments are Reinstated

In *Catskill III*, I dismissed plaintiffs' tortious interference with contract claim on the basis that the LPA had not received NIGC approval and was therefore void. Monticello's status as a third-party beneficiary has no bearing on that prior decision. Therefore, this court's earlier decision granting defendant's motion for summary judgment of plaintiff's claims for tortious

---

**10.** To the extent that the 1995 agreement may have required Catskill to procure a later agreement between the Tribe and Monticello, that duty was clearly fulfilled -as plaintiffs concede—by execution of the DCA, not the LPA.

**11.** The Master Amendment also contains amendments to the SFA and the Mortgage

Agreement. Thus, Plaintiffs' suggestion that Catskill's signature on the Master Amendment (even though the LPA was not amended) demonstrates that the Master Amendment was intended to touch on the LPA, misses the mark. (Pl. Mem. of Law at 19.) Catskill is a party to the SFA, which the Master Amendment does amend. (Weisburst Decl., Ex. S at ¶ 3.)

interference with contract and tortious interference with business advantage, is reinstated with the additional finding that Monticello is not a third-party beneficiary to the LPA.

### IV. *Conclusion*

In response to the questions posed by the Second Circuit's remand order, this court finds that federal jurisdiction is proper over the instant consolidated action, Monticello is not a third-party beneficiary to the LPA, and New York law permits third-party beneficiaries to recover damages for tortious interference with a contract. In light of the foregoing, this court reinstates its previous judgment granting defendant's motion for summary judgment of claims for tortious interference with contract and tortious interference with business advantage.