06-5860-cv
Catskill Development v. Park Place Entertainment

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2007

(Argued: May 12, 2008                                    Decided: October 21, 2008)

Docket No. 06-5860-cv

_____

CATSKILL DEVELOPMENT, L.L.C., MOHAWK MANAGEMENT, L.L.C., MONTICELLO
RACEWAY DEVELOPMENT COMPANY, L.L.C., CATSKILL LITIGATION TRUST,

*Plaintiffs-Appellants*,

PAUL DEBARY, JOSEPH BERNSTEIN,

*Consolidated-Plaintiffs-Appellants*,

− v. −

PARK PLACE ENTERTAINMENT CORPORATION,

*Defendant-Appellee*,

HARRAH'S OPERATING COMPANY, INC.,

*Consolidated-Defendant-Appellee*.

_____

Before NEWMAN, WALKER, and
SOTOMAYOR, *Circuit Judges*.

_____

Plaintiffs-appellants Catskill Development, L.L.C. ("Catskill"), Mohawk Management,
L.L.C. ("Mohawk"), and Monticello Raceway Development Company, L.L.C. ("Monticello"),
and consolidated-plaintiffs-appellants Paul DeBary and Joseph Bernstein (collectively, the
"Catskill Group"), claim that defendant-appellee Park Place Entertainment Corporation ("Park
Place") tortiously interfered with the Catskill Group's contractual and business relations with the
non-party Mohawk Indian Tribe (the "Tribe"), when Park Place entered into an exclusive

agreement with the Tribe to develop a casino. We affirm the district court's dismissal of the Catskill Group's tortious interference with contract claim on the ground that its contracts with the Tribe were void and otherwise unenforceable at the time of Park Place's alleged interference. We also affirm the district court's grant of summary judgment to Park Place on the Catskill Group's tortious interference with business relations claim on the ground that the Catskill Group has failed to establish a triable issue of fact that Park Place used wrongful means to interfere.

SANFORD I. WEISBURST, Quinn Emanuel Urquhart Oliver & Hedges, LLP (Andrew L. Frey, Mayer, Brown, Rowe, & Maw LLP, John P. Gallagher, Troutman Sanders LLP, *on the brief*) for Plaintiffs-Appellants.

GEORGE F. CARPINELLO, Boies, Schiller, & Flexner LLP (Martin Deptula, Teresa Monroe, Paul R. Verkuil, *on the brief*) *for Defendants-Appellees.*

SOTOMAYOR, *Circuit Judge*

These consolidated cases involve a dispute between a group of entities vying for the right to develop a casino in the Catskills with the non-party Mohawk Indian Tribe ("the Tribe"). As explained further below, plaintiffs-appellants Catskill Development, L.L.C. ("Catskill"), Mohawk Management, L.L.C. ("Mohawk"), and Monticello Raceway Development Company, L.L.C. ("Monticello"), and consolidated-plaintiffs-appellants Paul DeBary and Joseph Bernstein (collectively, the "Catskill Group"),[1] claim that defendant-appellee Park Place Entertainment

---

[1] Although consolidated-plaintiffs-appellants DeBary and Bernstein are not members of the Catskill Group, their arguments on appeal are identical to those of the remaining plaintiffs-appellants. Thus, for ease of reference, we draw no distinction between the two groups of appellants in characterizing their arguments on appeal, and refer to them collectively in this context as the Catskill Group. Further, as explained below, the Catskill Group is joined by the Litigation Trust, which is also a plaintiff to this case.

Corporation ("Park Place")[2] tortiously interfered with the Catskill Group's contractual and business relations with the Tribe, when Park Place entered into an exclusive agreement with the Tribe to develop a casino. We affirm the district court's dismissal of the Catskill Group's interference with contract claim on the ground that the Catskill Group's contracts with the Tribe were void and otherwise unenforceable at the time of the alleged interference. We affirm the district court's grant of summary judgment to Park Place on the Catskill Group's interference with business relations claim on the ground that the Catskill Group failed to establish a triable issue of fact that Park Place used wrongful means to interfere.[3]

## BACKGROUND

**A.     Regulatory Framework**

In 1988, Congress enacted the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701–2721 (2006), which provides a detailed regulatory framework for Indian gaming.[4] Congress's express purpose in passing IGRA was, *inter alia*, to "promot[e] tribal economic development, self-sufficiency, and strong tribal governments," while simultaneously "shield[ing

---

[2] Park Place is now owned by consolidated-defendant-appellee Harrah's Operating Company, Inc.

[3] We also affirm the district court's denial of the Catskill Group's motion for discovery sanctions because the district court had already granted relief for the alleged infractions by reopening discovery, which we find to be an appropriate remedy.

[4] IGRA divides Indian gaming into three categories: Class I includes traditional forms of gaming engaged in during tribal ceremonies; Class II is principally comprised of bingo games; and Class III includes all other forms of gaming, including casino "standards" such as roulette, blackjack, and slot machines. 25 U.S.C. § 2703(6)–(8).

tribes] from organized crime and other corrupting influences [and] ensur[ing] that . . . Indian tribe[s are] the primary beneficiar[ies] of . . . gaming operation[s]." *Id.* § 2702.

To conduct gaming, an Indian tribe must satisfy numerous prerequisites. As relevant to this case, the gaming must take place "on Indian lands . . . located within a State that permits such gaming." *Id.* § 2710(b)(1)(A). IGRA generally prohibits gaming on lands that became Indian lands subsequent to IGRA's enactment in October 1988, unless the Governor of the relevant State "concurs" with a determination by the Secretary of the Interior that it "would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community." *Id.* § 2719(b)(1)(A).

Moreover, IGRA provides for federal oversight of contracts between tribes and non-tribal entities regarding the management of tribal gaming operations. *Id.* §§ 2710(d)(9), 2711(g). Tribes may enter into contracts for the management of these gaming operations only with the approval of the National Indian Gaming Commission ("NIGC") Chairman. *Id.* § 2711(a)(1).[5] By regulation, unapproved management contracts are deemed "void." 25 C.F.R. § 533.7 (2008).

## B.    Factual Background

In 1996, the Catskill Group entered into a series of contracts with the Tribe[6] for the purpose of building and operating a casino at a site adjacent to the Monticello Raceway. Three of those contracts are at issue here:

---

[5] As discussed further below, a "management contract" is defined in the governing regulations as "any contract . . . or collateral agreement between an Indian tribe and a contractor . . . if such contract or agreement provides for the management of all or part of a gaming operation." 25 C.F.R. § 502.15.

[6] In the contracts the Tribe is referenced as the "St. Regis Mohawk Tribe." For simplicity, here the term "Tribe" is used throughout.

4

- A Land Purchase Agreement ("LPA") between the Tribe and Catskill, which, *inter alia*, provided for Catskill's transfer of 29 acres of land to the United States to be held in trust for the Tribe;

- A Management Agreement ("MA") between the Tribe and Mohawk, which, *inter alia*, detailed the duties and responsibilities of Mohawk, and the fees for its management services; and

- A Development and Construction Agreement ("DCA") between the Tribe and Monticello, which, *inter alia*, provided for the construction and development of the casino and surrounding lands.

All of these agreements, in some manner, required the Tribe to use its best efforts and to cooperate with the Catskill Group in obtaining the requisite government approvals.[7] However, despite having spent millions of dollars, the Catskill Group still had not received all the necessary state and federal approvals by April 2000, and the NIGC had denied the Catskill Group's application several times. Although the United States Bureau of Indian Affairs (the "BIA") had agreed to take the land at issue in trust for the Tribe, final approval was never provided because the New York Governor had not yet consented to the transfer, and the BIA had

---

[7] In particular, the LPA provided that: "The [Tribe] shall use its reasonable best efforts to cause this Agreement together with any other documents necessary to effectuate the Transfer to be filed with [the BIA]," and "the [Tribe] shall . . . cooperate with [Catskill] and any of its Affiliates and use [its] reasonable best efforts in good faith to assist in obtaining the approval of the [BIA] of the Trust Conveyance and any other documents or transactions related thereto."

The DCA provided that its provisions would become effective only upon receipt of the required regulatory approvals and further required the parties "to cooperate and to use their commercially reasonable efforts to satisfy [this] condition at the earliest possible date."

Likewise, the MA provided that the agreement would be effective on the date when "the Chairman of the NIGC grants written approval of this Agreement. The parties agree to cooperate and to use their commercially reasonable efforts to satisfy the above condition at the earliest possible date."

not made a final determination that the price ($10 million) to be paid by the Tribe for the land transfer did not exceed the land's fair market value.

Meanwhile, in mid-1999, Park Place sought an introduction to the Tribe through Ivan Kaufman, CEO of Presidents Resorts Casino, Inc. ("Presidents"), and Gary Melius, a real-estate developer, each of whom had pre-existing relationships with the Tribe. According to the Catskill Group, Park Place falsely represented to Kaufman that it would reward his efforts of favorably introducing Park Place to the Tribe by buying out his substantial investment in, and taking over the management of, the Tribe's struggling Akwesasne casino. Park Place also allegedly offered to Melius millions of dollars for an introduction to the Tribe, to be paid upon Park Place's acquisition of the Akwesasne management contract or upon Park Place's securement of an agreement with the Tribe regarding gaming operations in the Catskills/Monticello area. However, after Kaufman and Melius introduced Park Place to the Tribe, Park Place allegedly disavowed the agreements it had reached with those individuals.[8]

The Catskill Group alleges that during the ensuing negotiations between Park Place and the Tribe, Park Place misrepresented to the Tribe, *inter alia*, that the federal approval granted to Catskill to take land into trust for purposes of gaming was "portable," and that a casino project on another site would be approved within four months. Finally, and as described further below, Park Place also allegedly concocted, participated in, and acquiesced in a scheme with Kaufman to place a financial "squeeze" on the Tribe by slowing the Akwasasne casino's payroll, with the hope and intent that the Tribe would turn to Park Place for a financial bailout.

---

[8] Kaufman and Melius separately sued Park Place over the alleged breach of agreements and ultimately settled.

On April 14, 2000, the Tribe entered into a written agreement with Park Place, which set forth "certain understandings" reached between the parties: namely, that (1) Park Place would be the exclusive developer and manager of any Tribe casinos in New York (with certain exceptions not pertinent here); (2) Park Place and the Tribe would have a profit distribution of 70% to the Tribe and 30% to Park Place after the Tribe paid back Park Place for "advances" for the cost of development and construction; (3) Park Place would begin construction of a casino within 36 months unless otherwise agreed by the parties; (4) Park Place would pay the Tribe $3 million "for use by the Tribe in it's [sic] discretion," and which "shall be paid back to [Park Place] only in the event that the Tribe does not or is unable to enter into [certain] development, management and licensing agreements [with Park Place]; and (5) Park Place would indemnify the Tribe from litigation losses resulting from the Tribe's termination of its agreements with the Catskill Group.

Shortly after Park Place and the Tribe entered into this agreement, the Tribe and the Catskill Group ceased discussions with respect to the Monticello Raceway project.

C.      **Procedural History**

Catskill, Mohawk, and Monticello (i.e., the Catskill Group) commenced suit in November 2000 alleging, *inter alia*, that Park Place tortiously interfered with the Catskill Group's contractual relations with the Tribe ("Count I," or the "interference with contract claim"). In the alternative, the Catskill Group alleged that Park Place had tortiously interfered with its business relationships with the Tribe ("Count II," or the "interference with business relations claim").[9]

---

[9]  The Catskill Group also alleged unfair competition and antitrust claims against Park Place under New York state law, which the district court dismissed for failure to state a claim and are not at issue on appeal. *Catskill Dev., LLC v. Park Place Entm't Corp.*, 144 F. Supp. 2d

Upon Park Place's motion, the district court dismissed Count I on the grounds that none of the contracts at issue was enforceable in the absence of NIGC approval. *Catskill Dev., LLC v. Park Place Entm't Corp.*, 144 F. Supp. 2d 215, 232–34 (S.D.N.Y. 2001) ("*Catskill I*"). The district court, however, permitted Count II to proceed on the ground that there was a question of fact regarding whether the Catskill Group's losses stemmed directly from Park Place's actions. *Id.* at 238–39.

The Catskill Group moved for reconsideration, arguing, *inter alia,* that one of the contracts at issue—the LPA in particular—was enforceable without NIGC approval. The district court agreed and reinstated the interference with contract claim with respect to the LPA only. *Catskill Dev., LLC v. Park Place Entm't Corp.*, 154 F. Supp. 2d 696, 703–05 (S.D.N.Y. 2001) ("*Catskill II*").

Park Place then moved the district court for reconsideration of that decision. While its reconsideration motion was pending, Park Place also moved for summary judgment on the remaining claims for tortious interference with business relations. The district court granted Park Place's motion for summary judgment, thus disposing of the entire case. *Catskill Dev., LLC v. Park Place Entm't Corp*, 217 F. Supp. 2d 423, 446 (S.D.N.Y. 2002) ("*Catskill III*"). With respect to Count I, the court held (as it had originally held in *Catskill I*, but for different reasons) that the LPA was void without NIGC approval. *Id.* at 433. With respect to Count II, the court dismissed the interference with business relations claim on the grounds that the Catskill Group (1) offered no evidence that Park Place used "wrongful means" to induce the Tribe to terminate its relationship with the Catskill Group, and (2) could not meet its burden of showing that Park

_____

215, 239–41(S.D.N.Y. 2001).

8

Place caused the Catskill Group any harm in light of the many speculative regulatory contingencies. *Id.* at 435–46.

While the Catskill Group's appeal from that decision was pending, it moved in the district court pursuant to Federal Rule of Civil Procedure 60(b)(3) to vacate the judgment based on the Catskill Group's discovery of six audio tapes relevant to the interference with business relations claim that had not been produced during the discovery period. The district court held that Park Place's failure to disclose the tapes was the apparent product of "mistake" or misunderstanding, but nevertheless constituted "misconduct" for purposes of Rule 60(b) reopening. *Catskill Dev., LLC v. Park Place Entm't Corp.*, 286 F. Supp. 2d 309, 315 (S.D.N.Y. 2003) ("*Catskill IV*"). The court granted the Catskill Group thirty days to conduct further discovery with respect to the matters raised in the tapes. *Id.* at 321.

Shortly thereafter, in January 2004, the members of the Catskill Group assigned "all of their right, title and interest in . . . any and all [its] claims . . . against Park Place" to a trust (the "Litigation Trust"). *See* Declaration of Trust of Catskill Litigation Trust, § 2.1.[10] The Litigation Trust was then added as a plaintiff to the case.

After further briefing following the close of the additional discovery period, the district court held that the Catskill Group still had failed to produce any evidence of wrongful means for purposes of the interference with business relations claim, and reaffirmed its grant of summary judgment in favor of Park Place. *Catskill Dev., LLC v. Park Place Entm't Corp.*, 345 F. Supp. 2d

---

[10]  Available at http://www.sec.gov/Archives/edgar/data/1278539/000092189504000172/ex32tos1_02032004.htm.

360, 368 (S.D.N.Y. 2004) ("*Catskill V*"). The Catskill Group, now joined by the Litigation

Trust, reinstated its earlier appeal.

On appeal, a jurisdictional defect was revealed for the first time: two of the original

plaintiffs, Catskill and Mohawk, were not completely diverse from Park Place. Absent complete

diversity, federal jurisdiction did not exist under 28 U.S.C. § 1332. We thus remanded the case

to the district court to address, *inter alia*: (1) whether Park Place and Monticello were completely

diverse for jurisdictional purposes at the time the action was commenced; and (2) whether

dismissal of Catskill (the signatory to the LPA) and Mohawk (the signatory to the MA) from the

case would result in undue prejudice to Monticello (the signatory of the DCA) or Park Place.[11]

*Catskill Litig. Trust v. Park Place Entm't Corp.*, 169 Fed. App'x 658, 660–61 (2d Cir. 2006).

Upon the parties' stipulation, the district court signed an order, pursuant to Federal Rule

of Civil Procedure 21, dismissing from the original action all but Monticello and Park Place,

which the district court determined were completely diverse at the time the original complaint

was filed.[12] Subsequently, the trustees of the Litigation Trust filed a new complaint against Park

Place, and the district court consolidated the new and original actions under Federal Rule of Civil

---

[11] We also remanded for the district court to determine whether Monticello was a third-party beneficiary of the LPA and whether New York law permits a third-party beneficiary of a contract to recover damages for tortious interference with that contract, but those issues are not pertinent to our disposition of the case.

[12] Pursuant to the Rule 21 factors, the district court found "that Catskill and Mohawk were dispensable parties given that complete relief could be accorded between the remaining parties, and because any judgment against Monticello in this action would have preclusive effect against Catskill and Mohawk." *Debary v. Harrah's Operating Co.,* 465 F. Supp. 2d 250, 260 (S.D.N.Y. 2006). Additionally, the stipulation among the parties provided sufficient evidence that no party to the litigation would "suffer prejudice by virtue of the dismissal." *Id.* (citing *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 832 (1989)).

10

Procedure 42(a).  *Debary v. Harrah's Operating Co.,* 465 F. Supp. 2d 250, 260 (S.D.N.Y. 2006) ("*Catskill VI*").

After six district court opinions and two prior appeals, the case now returns to us for a third time.

**DISCUSSION**

**I.      JURISDICTION**

Although the parties do not contest our jurisdiction, we are obliged to ascertain it independently.  *See, e.g., Joseph v. Leavitt*, 465 F.3d 87, 89 (2d Cir. 2006) ("Although neither party has suggested that we lack appellate jurisdiction, we have an independent obligation to consider the presence or absence of subject matter jurisdiction *sua sponte.*").  We conclude that we have jurisdiction over both the original and consolidated action.  First, with respect to the original action that we previously remanded for a jurisdictional finding, we see no factual error in the district court's determination that the remaining parties—Monticello and Park Place—were completely diverse at the time that action was commenced.

Second, with respect to the subsequently commenced action by the trustees, we are satisfied upon our review of the trust agreement and our questioning of the parties at oral argument that diversity jurisdiction exists over that action as well.  For purposes of diversity jurisdiction, the citizenship of the fiduciary—not the beneficiary—generally controls.  *See O'Brien v. AVCO Corp.*, 425 F.2d 1030, 1032 (2d Cir. 1969) (citing *Dodge v. Tulleys*, 144 U.S. 451 (1892)).  An exception exists where there is evidence of collusion for the purpose of obtaining federal jurisdiction.  *See* 28 U.S.C. § 1359; *see also Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 465–66 (1980) (holding that trustees who were "real parties in interest" could invoke

11

diversity jurisdiction on the basis of their own citizenships, in the absence of allegations of sham or collusion to manufacture diversity jurisdiction).

Specifically, under the so-called "anti-collusion" statute, 28 U.S.C. § 1359, "[a] district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court." We explained in *Airlines Reporting Corp. v. S & N Travel, Inc.* that:

> We give careful scrutiny to assignments which might operate to manufacture diversity jurisdiction, the reasons for which we have made abundantly clear: such devices, unless controlled, can provide a simple means of expanding federal diversity jurisdiction far beyond [its] purpose. The cautious eye with which we view such assignments ensures that parties do not inappropriately channel ordinary tort and contract litigation, essentially disputes of a local nature, into the federal courts. Accordingly, we construe section 1359 broadly to bar any agreement whose "primary aim" is to concoct federal diversity jurisdiction.

58 F.3d 857, 862 (2d Cir. 1995) (citations and quotation marks omitted); *see also Kramer v. Caribbean Mills, Inc.*, 394 U.S. 823, 825–26 (1969) (explaining that the purpose of the anti-collusion statute was "to prevent the manufacture of Federal jurisdiction by the device of assignment") (internal quotation marks omitted). In assessing whether an assignment is improper or collusive, several factors may be relevant, including but not limited to: "the assignee's lack of a previous connection with the claim assigned; the remittance by the assignee to the assignor of any recovery; whether the assignor actually controls the conduct of the litigation; the timing of the assignment; the lack of any meaningful consideration for the assignment; and the underlying purpose of the assignment." *Airlines Reporting Corp.*, 58 F.3d at 863 (citations omitted). No single factor is dispositive. *Id.*

12

Here, we are satisfied that the Litigation Trust was not created for the improper purpose of manufacturing federal jurisdiction. To begin with, we are assured by appellants' counsel that the Trust was created *prior* to counsel's discovery of the jurisdictional defect. Moreover, a SEC filing supports the appellants' assurances to us that the Litigation Trust was created for a legitimate business purpose; to wit, as a "condition to closing" a consolidation deal among Catskill, Mohawk and Monticello. Finally, the express terms of the Trust agreement place full responsibilities and powers over the litigation in the Trustees, and we have no reason to believe that these terms of the agreement are not being honored. We are thus satisfied that jurisdiction exists over the consolidated cases before us. *See Navarro*, 446 U.S. at 463–65.

## II. INTERFERENCE WITH CONTRACT CLAIM

To state a contract-interference claim under New York law, a plaintiff must demonstrate the existence of a valid contract, the defendant's knowledge of the contract's existence, that the defendant intentionally procured a contract breach, and the resulting damages to the plaintiff. *E.g., Int'l Minerals & Res., S.A. v. Pappas*, 96 F.3d 586, 595 (2d Cir. 1996); *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y. 2d 413, 424, 646 N.Y.S. 2d 76, 82, 668 N.E.2d 1370, 1375 (1996). Only the first element—the existence of a contract—is at issue here. The district court held that the Catskill Group could not satisfy this element as a matter of law because its contracts with the Tribe were void in the absence of prior NIGC approval under 25 C.F.R. § 533.7 (providing that "[m]anagement contracts . . . that have not been approved by the Secretary of the Interior or the Chairman . . . are void").

On appeal, the Catskill Group raises three principal challenges to the district court's determination in this regard. First, it claims that the federal voiding provisions do not apply to

13

any of the contracts at issue—the MA (Management Agreement), the LPA (Land Purchase Agreement), and the DCA (Development and Construction Agreement)—because these contracts concern lands that are not yet "Indian lands." Second, the Catskill Group argues that the voiding provisions do not invalidate the Tribe's precursory obligations to act in good faith in seeking required agency approvals. Third, it argues that even if the voiding provision of 25 C.F.R. § 533.7 applies to the MA, it does not apply to the LPA or DCA because those agreements do not contain gaming management provisions.[13] We address, and reject, each of these assertions in turn below.

### A. "Indian Lands"

IGRA defines "Indian lands," in relevant part, as "lands within the limits of any Indian Reservation" or "lands title to which *is* . . . held in trust by the United States for the benefit of any Indian tribe." 25 U.S.C. § 2703(4) (emphasis added).[14] The Catskill Group argues that while the LPA contemplated a land transfer from Catskill to the United States in trust for the Tribe, the land was owned by Catskill at all relevant times, and thus was not land that "is" Indian land subject to the NIGC's voiding provision. The Catskill Group further asserts that this interpretation does not result in a regulatory gap because any proposed gaming on lands not yet held in trust would be regulated by state law, and nothing in IGRA would require states to allow Indian gaming on the site. We disagree with this interpretation of IGRA.

---

[13] The Catskill Group also alleges that New York law allows a contract interference claim even where the underlying contract is void under federal law. Because New York law plainly predicates contract interference on the existence of a valid contract, this argument is frivolous.

[14] Likewise, 25 U.S.C. § 81 defines "Indian lands" to include "lands the title to which *is* held by the United States in trust for any Indian tribe." (emphasis added).

To begin with, the NIGC's authority to approve management contracts does not appear to hinge on whether the contract relates to Indian lands. Neither the governing statutes relating to gaming management contracts, 25 U.S.C. §§ 2710(d)(9), 2711, nor the NIGC's implementing regulations, 25 C.F.R. §§ 533.1, 533.7,[15] expressly require that a gaming contract relate to Indian lands for it to be subject to NIGC approval. Indeed, the absence of any mention of "Indian lands" in § 2710(d)(9) or § 2711 stands in contrast to many of the surrounding statutory provisions, which are *expressly* limited in some way to Indian lands. *See, e.g.*, 25 U.S.C. §§ 2710(d)(1), (2), (3), (5), (7), (8) (relating to class III gaming "on Indian lands"); *id.* §§ 2710(b) (1), (2), (4) (relating to class II gaming "on Indian lands").

Even if we were to read an "Indian land" requirement into the governing statutes and regulations at issue, we would nevertheless reject the Catskill Group's proposed application of any such requirement to the circumstances of this case. The Dictionary Act, 1 U.S.C. § 1, instructs that "[i]n determining the meaning of any Act of Congress, unless the context indicates

---

[15] 25 C.F.R. § 533.1 provides:

Subject to the Chairman's approval, an Indian tribe may enter into a management contract for the operation of a class II or class III gaming activity.
(a) Such contract shall become effective upon approval by the Chairman.
(b) Contract approval shall be evidenced by a Commission document dated and signed by the Chairman. No other means of approval shall be valid.
(c) Contracts approved by the Secretary remain effective until approved or disapproved by the Chairman.

25 C.F.R. § 533.7 provides:

Management contracts and changes in persons with a financial interest in or management responsibility for a management contract, that have not been approved by the Secretary of the Interior or the Chairman in accordance with the requirements of this part, are void.

otherwise . . . words used in the present tense include the future as well as the present." Thus, when construing the definition of "Indian lands" in 25 U.S.C. § 2703(4), the Dictionary Act instructs us to read the words "which *is* held in trust " to also include land that *will be* held in trust. *Cf. Guidiville Band of Pomo Indians v. NGV Gaming, Ltd.*, 531 F.3d 767, 784 (9th Cir. 2008) (Smith, J., dissenting).[16] The Catskill Group's narrow interpretation—which would give the NIGC review authority over only contracts relating to already existing Indian land—would thwart Congress's intent to have the NIGC oversee contracts for the purpose of promoting the best interests of Indian tribes. *See* 25 U.S.C. §§ 2701, 2702. There is no dispute here that the purpose of all of the contracts at issue was to build and operate a casino on what was intended to become Indian land. Indeed, in the absence of acquisition of Indian land, the casino project was a non-starter both by law, *see* 25 U.S.C. § 2701(5), and contract.

Moreover, the Catskill Group's argument that states would fill the IGRA regulatory gap falls short. Congress intended that there would be both federal and state review of gaming contracts; however, the two serve entirely separate functions. Federal approval is designed to ensure that the contracts tribes enter into are fair and reasonable. State compacts, however, are

---

[16] In *Guidiville*, the Ninth Circuit addressed the meaning of "is" in the context of 25 U.S.C. § 81's definition of Indian lands. 531 F.3d at 774. The majority opinion concluded, in that context, that "is" should be given its literal meaning and that the Dictionary Act did not apply because the "context" in which the term was used appeared to indicate that Congress did not intend "is" to mean "will be." *Id.* at 774–79. *Guidiville* is distinguishable insofar as it was interpreting § 81, which expressly pertained to encumbrances of "Indian land," rather than to management contracts. *Id.* at 769. Moreover, in *Guidiville*, no land had yet been acquired or even identified for gaming purposes by either of the contracting parties. *Id.* at 770–71. To the extent these differences are not material to the Ninth Circuit's majority opinion, we nevertheless agree with Judge Smith's dissenting view that transactions involving land that "will be" held in trust trigger the agency's review authority, especially where specific land to be taken into trust is identified in the operative agreements. S*ee id.* at 783–87.

designed to protect the state's taxing authority and police powers over gaming and are not designed to protect tribal interests.

In reaching our conclusion that the NIGC's review and approval authority extends to the contracts at issue, we have considered the 2000 opinion letter by the deputy general counsel for the NIGC issued in an unrelated case—but relied upon by the Catskill Group here—that asserts that land intended to be placed into trust, but not yet held in trust by the United Sates, is not Indian land. Letter from Penny J. Coleman, Deputy General Counsel, NIGC to Chief, Region V (July 30, 2001) ("Coleman Opinion Letter").[17] Because this position was set forth in an opinion letter and has not been promulgated by an NIGC regulation, this Court owes it only the limited deference set forth in *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). *See Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (holding that agency interpretations in opinion letters "lack the force of law" and are entitled only to *Skidmore* deference). As such, the interpretation reflected in the Coleman Opinion Letter is entitled to deference only to the extent that it has the power to persuade us. *Id.* We conclude this letter lacks persuasive power.

The Opinion Letter is based on nothing more than a literal reliance on the statutory language's use of the present tense, which, for the reasons we have already explained, is contrary to the Dictionary Act and would be inconsistent with congressional design. Moreover, we have reason to doubt that the deputy counsel expected her opinion to be binding in future, unrelated cases. Her conclusions were hedged as "preliminary" and were expressly limited to the facts

---

[17] The Opinion Letter states: "While we understand that the Tribe seeks to have these lands placed into trust, these lands are not presently held in trust by the United States for the benefit of the Tribe. Therefore, the lands . . . are not trust lands [for purposes of 25 U.S.C. § 2703(4)(b)]," and are thus not Indian lands. Coleman Opinion Letter at 3.

before her.  *See* Coleman Opinion Letter at 1.  Further, we believe it is telling that in the cases currently before us, the NIGC actively reviewed the at-issue contracts, and, as discussed further below, rejected them.  Thus, to the extent the Opinion Letter reflected NIGC policy regarding "Indian lands," this policy appears to be inoperative based on the NIGC's actions in these cases.  Under these circumstances, we decline to defer to the Opinion Letter.

### B.     "Operative" Versus "Precursory" Obligations

We also reject the Catskill Group's assertion that the federal voiding provisions apply at most to the "operative" provisions of the contracts at issue, but not the "precursory" obligation of the Tribe to use reasonable best efforts in obtaining the requisite government approvals.  The same argument was rejected by the Ninth Circuit in *A.K. Mgmt. Co. v. San Manuel Band of Mission Indians*, 789 F.2d 785, 788–89 (9th Cir. 1986).  In *A.K.*, a bingo contractor entered into an agreement to construct a bingo facility and operate bingo games on the Indian tribe's reservation.  *Id.* at 786.  The agreement was never signed or approved by the BIA, which, prior to the establishment of the NIGC, was the agency responsible for overseeing gaming contracts under 25 U.S.C. § 81.  *Id.*  Three days after the agreement was signed, the contractor was notified that the Indian tribe would not recognize the agreement.  *Id.*  The contractor filed a suit in district court seeking a declaration that the agreement was valid, binding, and enforceable, but the district court dismissed the contractor's complaint.  *Id.*  On appeal, the contractor argued, *inter alia*, that the tribe was subject to both an express and implied duty of good faith and fair dealing to seek the BIA's approval.  *Id.* at 788.  The contractor further argued that the tribe should not be allowed to escape contractual liability by its own failure to act.  The Ninth Circuit rejected these arguments, explaining:

18

Whatever the persuasive force of these arguments, it is doubtful that general contract principles apply to an agreement subject to 25 U.S.C. § 81 (1982).  Section 81 explicitly provides that a contract is "null and void" without written approval from the BIA.  Therefore it is logical to conclude that an agreement without BIA approval must be null and void in its entirety.  No part of it may be enforced or relied upon unless and until BIA approval is given.  BIA approval is an absolute prerequisite to the enforceability of the contract.  To give piecemeal effect to a contract as urged by [appellant], would hobble the statute.  The plain words of section 81 simply render this contract void in the absence of BIA approval.  Since it is void, it cannot be relied upon to give rise to *any* obligation by the [tribe], including an obligation of good faith and fair dealing.  Accordingly, we find that general contract principles do not impose a duty on the [tribe] to seek BIA approval of the Agreement.

*Id.* at 789 (footnote omitted).

We are persuaded by both the reasoning and holding of *A.K.*  Like § 81, the federal review provisions at issue in our case are broadly worded, are designed to protect the best interests of Indian tribes, and do not draw the distinction between operational and precursory obligations urged upon us by the Catskill Group.

Moreover, we are unmoved by the Catskill Group's broader policy argument that the enforcement of good faith obligations is, on balance, in the best interest of Indian tribes.  Specifically, the Catskill Group argues that it "hardly serves tribal interests to have 'freedom' to walk away from a bargained-for obligation to seek approval after its contracting partner has spent much time and money doing the arduous legwork involved in the approval process; rather, this will only imperil a tribe's ability in the first instance to find worthy partners prepared to contract on favorable terms."

While in theory it is *possible* that investors may be less inclined to deal with Indians who are free to disregard obligations to perform in good faith, we are aware of no empirical evidence that supports this concern.  Indeed, to allow tribes the ability to walk away from a deal prior to

19

agency approval seems at least equally likely to promote the ends of IRGA: an investor who fears losing a tribe's partnership to a competitor can protect itself by offering a more attractive deal to a tribe, which is in that tribes's best interest.

Finally, the Catskill Group's reliance on *Vanadium Corp. of Am. v. Fidelity & Deposit Co.*, 159 F.2d 105 (2d Cir. 1947), is unavailing. In *Vanadium*, two non-Indian parties contracted for a variety of mining lease assignments. *Id.* at 106. Because the land underlying the leases belonged to the Navajo tribe of Indians, a federal statute was triggered, requiring pre-approval by the Secretary of the Interior for any transfer or assignment of a mining lease on Indian land. *Id.* (citing 25 U.S.C. § 396a). Additionally, the parties separately contracted for a provision providing that "in the event the assignments were not approved . . . the agreement would be deemed cancelled." *Id.* Thereafter, the plaintiff determined that the assignments were unfavorable, refused to cooperate in seeking federal approval (which consequently was denied), and sought return of his deposit, arguing that the contracts were "dead" without approval. *Id.* at 107-08. This Court disagreed, explaining that "[i]t was surely not the intent of the parties when they made an apparently binding assignment that the plaintiff should have the power to invalidate the assignment by not filing it for approval. On the contrary, it must have been assumed that plaintiff would reasonably file it and in good faith seek its approval." *Id.* at 108.

While the above-quoted language from *Vanadium* offers some support for the Catskill Group's theory that agreements to act in good faith are enforceable even prior to receipt of government approval, *Vanadium* did not establish a *per se* rule to that effect. Moreover, *Vanadium* is distinguishable from this case in two crucial respects. First and foremost, in *Vanadium* the plaintiff's argument that the agreement was void absent federal approval had a

20

contractual genesis; neither the statute nor regulation at issue, 25 U.S.C. § 396a and 25 C.F.R. § 186.26, contained a voiding provision. Accordingly, this Court applied the general contract principle of good faith to decide the case. *See id.* at 108 (noting plaintiff's breach of a "condition precedent"—good faith—to the contract and citing to the Restatement (Second) of Contracts § 395). Here, however, we confront a voiding provision entrenched within a federal regulation, 25 C.F.R. § 533.7, suggesting a federal intent that, lacking the Secretary's approval, contracts subject to IGRA are void *ab initio,* notwithstanding general contract principles to the contrary, like good faith. Second, unlike in this case, the parties in *Vanadium* were not Indian, thus the underlying policy of promoting Indian interests was not upset by the invocation of general contract principles. Indeed, such policy concerns did not appear to have been given any consideration by the panel in that case.[18]

---

[18] The Catskill Group also relies on *Thorstenson v. Norton,* 440 F.3d 1059, 1060 (8th Cir. 2006), where an Indian and his non-Indian wife contracted to sell various land tracts to two non-Indian purchasers (Thorstenson's predecessors-in-interest), including land held in trust by the United States. Under 25 C.F.R. § 152.17, trust land requires authorization from the Secretary of the Interior before it can be sold, and a separate contract stipulated that if such authorization was not acquired the sellers would transfer into escrow money the buyers had already conveyed as a down payment. *Id.* at 1060–61. The sellers ultimately refused to transfer the trust land and never placed the buyers' (now Thorstenson's) deposit into escrow. *Id.* at 1061. Thorstenson successfully sued for the return of the deposit money, as the Eighth Circuit concluded that "[w]hether or not the BIA had yet approved of the initial contracts is neither here nor there as to Thorstenson's recovery for money paid, prematurely, for the trust land at issue . . . ." *Id.* at 1064. The Catskill Group uses *Thorstenson* to buttress its "precursory obligation" theory that even if the agreements at issue are generally void without NIGC approval, provisions that required the Tribe to act in good faith, like the escrow agreement in *Thorstenson*, are enforceable. But *Thorstenson* does not analogize well to the situation before us and is thus unpersuasive. The court in *Thorstenson* emphasized the "separate nature of the escrow agreement" and that the claim for the return of the deposit "did not involve title to the trust land at all—only money." *Id.* at 1064. At most, *Thorstenson* stands for the proposition that a buyer has legal recourse where a Native American seller breaches an escrow agreement to return the buyer's deposit if a sale of trust land is not consummated. *See id.* ("Nothing should hinder an Indian's right to enter into a binding escrow agreement that states 'I'm going to comply with the law.'"). But here, the

21

Accordingly, we reject the Catskill Group's contention that the purported good-faith obligations in the contracts somehow bound the Tribe to use reasonable best efforts in obtaining the requisite government approvals.[19]

## C.     Management and Collateral Agreements

Having rejected the Catskill Group's threshold "Indian land" and "precursory obligation" arguments, we now turn to the question of whether the contracts at issue were "management contracts" void under 25 C.F.R. § 533.7, or otherwise unenforceable. *See Scutti Enters., LLC v. Park Place Entm't Corp.*, 322 F.3d 211, 215 (2d Cir. 2003) ("[I]n the absence of an enforceable contract, it was appropriate to dismiss Scutti's cause of action for tortious interference with contractual relations.").

As noted above, § 533.7 provides that: "*Management contracts* . . . that have not been approved by the Secretary of the Interior or the Chairman in accordance with the requirements of this part, are void." 25 C.F.R. § 533.7 (emphasis added). In turn, the regulations define a "management contract" as "any contract, subcontract, or *collateral agreement* between an Indian

---

Catskill Group seeks prospective damages, which are intimately tied to a variety of casino operating contracts that failed to receive federal approval. Without such approval those contracts are void, just like the underlying contract for the sale of land in *Thorstenson*, which the Eighth Circuit—separate from its analysis of the escrow agreement—notably deemed unenforceable absent BIA approval. *See id.* 1064–65 n.4 (finding that Thorstenson "has no tenancy rights at this time and it was unreasonable for him to believe otherwise" because "that tenancy is subject to BIA approval, which has not yet been given").

[19] We leave open the issue of whether other types of contractual obligations in management contracts (e.g., arbitration clauses) are severable and enforceable prior to receiving government approval of the contract as a whole. For purposes of this case, we hold only that the obligation to act in good faith, and general contract principles that favor such a policy in other contexts, yield to the regulatory dictate that unapproved contracts are void. *See* 25 C.F.R. § 533.7.

22

tribe and a contractor . . . *if such contract or agreement provides for the management of all or part of a gaming operation.*" *Id.* § 502.15 (emphasis added). A "collateral agreement" includes "any contract . . . that is related, either directly or indirectly, to a management contract." *Id.* § 502.5.

As an initial matter, the MA (Management Agreement) entered into between Mohawk and the Tribe, which provided for the management of the putative casino, is clearly subject to section 533.7's voiding provision. The more difficult question is whether the remaining two contracts at issue—the LPA (Land Purchase Agreement) entered into between Catskill and the Tribe, and the DCA (Development and Construction Agreement), entered into between Monticello and the Tribe—are also subject to the voiding provision or are otherwise unenforceable.

It is undisputed that both the DCA and LPA are "collateral agreements" to the MA insofar as they are "related" to that contract. *See id.* § 502.5. But a collateral agreement is subject to agency approval under *Id.* § 533.7 only if it "provides for the management of all or part of a gaming operation." *Id.* § 502.15; *see also Machal, Inc. v. Jena Band of Choctaw Indians*, 387 F. Supp. 2d 659, 665–67 (W.D. La. 2005).[20] Whether an agreement meets this requirement depends on the circumstances and is not always self-evident. *See First Am. Kickapoo Operations L.L.C. v. Multimedia Games, Inc.*, 412 F.3d 1166, 1172–75 (10th Cir. 2005) (holding that

---

[20] To the extent that the district court interpreted the regulations as requiring NIGC approval of *all* collateral contracts, it erred. However, we affirm the district court's decision for the reasons explained in the text. *See ACEquip Ltd. v. Am. Eng'g Corp.*, 315 F.3d 151, 155 (2d Cir. 2003) ("Our court may, of course, affirm the district court's judgment on any ground appearing in the record, even if the ground is different from the one relied on by the district court.").

23

operating lease constituted a management agreement); *Machal*, 387 F. Supp. 2d at 667 (holding

that a "settlement agreement," which expressly purported not to be a "gaming agreement," was in

fact a management contract insofar as it allocated management authority in regards to a casino);

*see also* 57 Fed. Reg. 12,382–01, 12,388 (April 9, 1992) (NIGC will review for approval any

agreement, however labeled, the subject matter of which is the "management of a gaming

operation").

In this case, Park Place argues that the DCA and LPA were management contracts insofar

as they contained hidden management fees. In particular, Park Place claims that the DCA's 5%

development fee and the LPA's $10 million purchase price were intended as back-door

management compensation. Further, with respect to the DCA only, Park Place points out that

Monticello was to be repaid for the construction of the proposed casino from the proceeds

derived from the operation of the casino. *See Machal*, 387 F. Supp. 2d at 667–68 (holding that

one of the agreements at issue was a management contract, in part, because it required the tribe to

repay from gaming revenues the loans it received from plaintiff for construction of the casino and

other costs); *see also In re SRC Holding Corp.*, 352 B.R. 103, 174–78 (Bankr. D. Minn. 2006)

(pledge agreement that purported to assign to lender the manager's rights to management fees

constituted a management contract subject to NIGC approval), *rev'd in part on other grounds*,

364 B.R. 1 (D. Minn. 2007).

We need not independently determine whether the DCA or LPA are collateral agreements

subject to agency approval because: (1) the agency appears already to have made that

determination, *see United States ex. rel. Bernard v. Casino Magic Corp.*, 293 F.3d 419, 425 (8th

Cir. 2002) (deferring to NIGC's determination that agreement was a management contract

24

subject to approval); (2) at all relevant times the contracting parties treated these agreements as being subject to agency approval; (3) and the terms of the contracts themselves contemplated agency approval, *see Scutti*, 322 F.3d at 215 (agreeing with district court finding that "under its unambiguous terms, Scutti's proposed contract with the Mohawks was not effective or binding—and therefore not enforceable—until approved by the NIGC").

Specifically, both the DCA and the LPA were submitted to the NIGC for review. With respect to the DCA, the NIGC's Director of Contracts stated in an April 19, 2000 letter denying agency approval that it had "determined that the [MA] and DCA together are management contracts and are subject to NIGC approval." Moreover, with respect to the LPA, the NIGC Director of Contracts by letter twice requested an explanation for the Tribe's proposed purchase price for the land, and expressed the concern that the purchase price was a hidden management compensation. Although the Catskill Group responded that the purchase price was a fair one, at no time did it challenge, at the agency level, the NIGC's determination that the LPA was subject to its approval. The same is true with respect to the terms of the DCA. Indeed, in Master Agreements entered into between the Tribe and the Catskill Group in 2000, the parties expressly recited that the agreements "for the purchase of the property, [i.e., the LPA] and the development, [and] construction . . . of the gaming facility" [i.e., the DCA] had been submitted to the NIGC and the BIA "for review *and* approval." (emphasis added). Moreover, by their terms both the LPA and DCA contemplated prior agency approval by the BIA. In particular, the DCA's effective date was contingent upon receipt of BIA approval, while the LPA's land deal was contingent upon the BIA's approval of the transfer of land into trust for the Tribe.

25

Under these circumstances, we conclude that all of the contracts at issue were void under § 533.7 absent the requisite agency approval(s). Accordingly, we affirm the district court's dismissal of the Catskill Group's interference with contract claim.

## III.    INTERFERENCE WITH BUSINESS RELATIONS CLAIM

In the absence of enforceable contracts, the Catskill Group hopes to prevail on a claim for tortious interference with business relations. To state a claim for this tort under New York law, four conditions must be met: (1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship. *See Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 214 (2d Cir. 2002) (describing the tort by an alternative name, "tortious interference with prospective economic advantage"); *Goldhirsh Group, Inc. v. Alpert* 107 F.3d 105, 108–09 (2d Cir. 1997) (stating the elements as constitutive of "tortious interference with . . . business relations"). Only the third and fourth elements are at issue here, and we do not reach the latter because we conclude below that the Catskill Group has failed to present a triable issue of fact on element three, wrongful means.

The wrongful means requirement makes alleging and proving a tortious interference claim with business relations "more demanding" than proving a tortious interference with contract claim. *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 191, 428 N.Y.S.2d 628, 632, 406 N.E.2d 445, 449–50 (1980) (describing the interference with business relations tort by an alternative name, "interference with prospective contractual relations" and describing element three as "wrongful means"). The standard is more demanding because a

26

plaintiff's mere interest or expectation in establishing a contractual relationship must be balanced against the "competing interest of the interferer," *id.,* 428 N.Y.S.2d at 632, 406 N.E.2d at 449, as well as the broader policy of fostering healthy competition, *NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc.*, 87 N.Y.2d 614, 623, 641 N.Y.S.2d 581, 586, 664 N.E.2d 492, 497 (1996). While a defendant's commission of a "crime or an independent tort" clearly constitutes wrongful means, such acts are not essential to find wrongful means. *See Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 189, 785 N.Y.S.2d 359, 361–62, 818 N.E.2d 1100, 1102–03 (2004); *see also Hannex Corp. v. GMI, Inc.*, 140 F.3d 194, 206 (2d Cir. 1998) (holding that participating in a knowing breach of fiduciary duty can constitute wrongful means).

Here, the Catskill Group contends that the record contains ample evidence to permit reasonable jurors to conclude that Park Place engaged in wrongful means. The Catskill Group's claim centers around the following three themes:

- Park Place defrauded two individuals—Gary Melius and Ivan Kaufman—to obtain favorable introductions to the Tribe, and then defrauded the Tribe by falsely representing to the Tribe that no delay in the project would be occasioned by partnering with Park Place;

- Park Place committed the tort of knowing participation in another's breach of fiduciary duty, specifically Kaufman's breach of his fiduciary duty to the Tribe, by intentionally slowing payroll at the Akwesasne casino. Park Place then "ratified" or knowingly accepted the benefits of that breach by positioning itself as the Tribe's financial savior; and

- Park Place exerted economic pressure on the Tribe by making Park Place's $3 million loan to the Tribe contingent upon the Tribe's abandonment of the Catskill Group.

We reject each of these theories.

### A.     Park Place's Alleged Fraud

#### 1.     Alleged Fraud Against Melius and Kaufman

27

There is no dispute that Park Place gained initial access to the Tribe through Melius and Kaufman, each of whom had pre-existing relationships with the Tribe. The Catskill Group contends, however, that Park Place used fraudulent means to induce Melius and Kaufman to introduce Park Place to the Tribe, thereby committing the requisite wrongful act for an interference claim.

The district court—without determining whether Park Place had engaged in the fraud alleged—held that Park Place's action could not form the basis of an interference with business relations claim because the alleged conduct was not directly injurious to either the Catskill Group or the Tribe. *Catskill III*, 217 F. Supp. 2d at 439–40. The district court's holding is entirely consistent with what we have previously recognized in other contexts: a plaintiff must "demonstrate *both* wrongful means *and* that the wrongful acts were the proximate cause" of the alleged injury. *State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 171–72 (2d Cir. 2004) (citing *Pacheco v. United Med. Assocs., P.C.*, 305 A.D.2d 711, 712, 759 N.Y.S.2d 556 (3d Dep't 2003)); *Jabbour v. Albany Med. Ctr.*, 237 A.D.2d 787, 790, 654 N.Y.S.2d 862 (3d Dep't 1997). Because any fraud by Park Place against Kaufman and Melius did not directly cause the Catskill Group (or the Tribe) any harm, this theory of liability fails as a matter of law. *See Excel Group, Inc. v. Permis Constr. Corp.*, 254 A.D.2d 451, 452, 678 N.Y.S.2d 778, 778 (2d Dep't 1998) (defendant's improper use of a report in violation of its agreement with a third-party did not make the defendant's interference with plaintiff's business relationship "wrongful").

Two cases upon which the Catskill Group relies—*Sommer v. Kaufman*, 59 A.D.2d 843, 399 N.Y.S.2d 7 (1st Dep't 1977), and *Pagliaccio v. Holborn Corp.*, 289 A.D.2d 85, 734

28

N.Y.S.2d 148 (1st Dep't 2001)—are inapposite. In both of those cases the defendant's wrongful conduct against third-parties bore a direct nexus to the relationship with which the defendant interfered. *See Sommer*, 59 A.D.2d at 843, 399 N.Y.S.2d at 7–8 (defendants directly injured plaintiff by bribing public official to deny plaintiff a building permit for the subject project); *Pagliaccio*, 289 A.D.2d at 85, 734 N.Y.S.2d at 149 (defendants alleged to have directly injured plaintiff by threatening plaintiff's employer with harm if plaintiff's employment was not terminated). Here, by contrast, the alleged fraud against Melius and Kaufman—which netted an introduction to the Tribe—had at most a tenuous relation to the harm alleged.

### 2.      Alleged Fraud Against the Tribe

The Catskill Group's claim that Park Place also committed fraud against the Tribe when, in the final stages of negotiations, Park Place announced that it could "switch" the limited approval the Catskill Group had obtained to Park Place's site "without any significant loss of time." The district court held that Park Place's assurance (which turned out to be false) was not actionable because it was mere "puffery," and the Tribal Chiefs testified that they "did not rely on [Park Place's] corporate braggadoccio." *Catskill III*, 217 F. Supp. 2d at 437.

Although the Catskill Group acknowledges the general principle that statements of opinion generally cannot constitute fraud, *see, e.g., George Backer Mgmt. Corp. v. Acme Quilting Co.,* 46 N.Y.2d 211, 220, 413 N.Y.S.2d 135, 140, 385 N.E.2d 1062, 1067 (1978), the Catskill Group relies on the narrow exception to that rule: namely, that opinions "*may* constitute actionable fraud where a present intent to deceive exists." *Magnaleasing, Inc. v. Staten Island Mall*, 563 F.2d 567, 569 (2d Cir. 1977) (emphasis added); *see also Harsco Corp. v. Segui*, 91 F.3d 337, 346 n.7 (2d Cir. 1996) ("[F]raud liability may attach when a person state[s] that

29

something was to be done when he kn[ows] all the time it was not to be done and that his representations were false." (internal quotation marks omitted)). In particular, the Catskill Group maintains that Park Place made the assurance of timeliness to the Tribe knowing full well that its assurance was false.

The fatal shortcoming of the Catskill Group's theory, however, is the absence of any facts to support it. Clive Cummis—Park Place's former vice-president, who made the alleged assurance—testified that his statement was based upon his then-knowledge of the federal approval process, which was based on advice of counsel. Moreover, the Tribal Chiefs testified in their depositions that they did not rely on Park Place's alleged assurance, and that testimony stands uncontroverted. Absent any evidence that Cummins's statement was motivated by an attempt to deceive, that it did in fact deceive the Tribe, or that Park Place had any knowledge superior to the Tribe's with respect to the anticipated timing of events beyond either party's control, the district court properly rejected the Catskill Group's allegation of wrongful means against the Tribe.

### B. Participation in Kaufman's Breach of Fiduciary Duty to the Tribe

The Catskill Group further contends that Park Place used wrongful means insofar as it knowingly participated in a breach of fiduciary duty owed to the Tribe by Kaufman as the principal of the manager of the Tribe's Akwesasne casino. More specifically, the Catskill Group contends that Kaufman improperly used his position at Akwesasne to "slow" that casino's payroll, in an attempt to put a financial "squeeze" on the Tribe, with the ultimate aim of inducing the Tribe to look to Park Place for a financial bailout. The Catskill Group contends that Kaufman was motivated by the significant fee allegedly promised to him by Park Place in the

30

event that Park Place took over the management contract at Akwesasne and/or entered into a contract with the Tribe for a new casino in the Catskills.

In *Hannex Corp.,* we recognized that the commission of the tort of knowing participation in a breach of fiduciary duty supports a finding of wrongful means. 140 F.3d at 206. The elements of that tort are: (1) a breach by a fiduciary of obligations to another; (2) the defendant's knowing inducement of or participation in the breach; and (3) damages suffered by the plaintiff from the breach. *Id.* at 203. With respect to the second element, "[o]ne participates in a fiduciary's breach if he or she affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables it to proceed." *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 284 (2d Cir. 1992), *overruled on other grounds by Gerosa v. Savasta & Co.*, 329 F.3d 317, 319 (2d Cir. 2003).

As factual support for its claim that Park Place knowingly participated in Kaufman's alleged breach of duty to the Tribe, the Catskill Group relies almost exclusively on an excerpt from a taped conversation on February 16, 2000 between Kaufman and Cummis:

> KAUFMAN: . . . But you got to remember the pressure on them with how we're squeezing them in Akwesasne is huge. I mean they—you know, I have kind of delayed their payrolls and—
>
> CUMMIS: Yeah.
>
> KAUFMAN: —slowed it down so badly that, you know, they're looking at Arthur as the savior [i.e., Arthur Goldberg, Park Place's then-CEO].
>
> CUMMIS: Yep, they are.
>
> KAUFMAN: And it is great. I mean I never would have thought that you would have gotten where you have gotten, but I guess Arthur is a genius.
>
> CUMMIS: He's pretty good. I'm not bad. He's pretty good.

31

KAUFMAN:  You must be a hell of a team.

CUMMIS:  Yeah.

KAUFMAN:  I mean I have been around a little bit, but not as much as you guys. But to take a situation like this—remember we started with our letter of intent and they said never would they give an exclusive.

CUMMIS:  Yeah.

KAUFMAN:  But you guys can maneuver.  I'm impressed.

CUMMIS:  They've given it to us now.  Now, we had better get together about the financial situation.

    * * *

The Catskill Group contends that reasonable jurors could infer from this conversation that Park Place:  (1) devised the alleged scheme to financially squeeze the Tribe; (2) provided advice or encouragement to act; (3) provided financial comfort to Kaufman by offering him money in the event that Park Place took over the management of Akwesasne; and (4) ratified Kaufman's breach by entering into agreements with the Tribe notwithstanding Park Place's knowledge of Kaufman's breach.

The first two contentions warrant little discussion.  The tape at most suggests that Park Place knew about Kaufman's plan to financially squeeze the Tribe through payroll slowdown. There is no evidence, however, that Park Place devised the scheme.  Moreover, given that the conversation in the tape occurred *after* the payroll slowdowns, the tape itself cannot be used to demonstrate that Park Place provided advice or encouragement to act.

32

The Catskill Group's remaining contentions warrant closer scrutiny, however. With respect to their "financial support" theory, the Catskill Group principally relies on *S & K Sales Co. v. Nike, Inc.* 816 F.2d 843 (2d Cir. 1987), in which we held that the defendant had participated in the breach of a third-party's fiduciary duty to his employer, the plaintiff. *Id.* at 850. Although it is fair to assume from the facts of that case that the third-party took comfort in breaching his duty to plaintiff in light of defendants' offer of employment to the third-party, it was not on that basis—and certainly not on that basis alone—that we found the defendant to have knowingly participated in the breach of fiduciary duty. Rather, unlike in this case, the evidence in *S & K Sales Co.* was that the defendant directly and concretely participated in the breach of duty by, *inter alia*, (1) sending misleading letters to the plaintiff on the basis of the third-party fiduciary's request, and (2) authorizing the third-party fiduciary to solicit the plaintiff's employees to work for defendant. *Id.* Thus, even if Park Place had assured Kaufman of financial comfort to induce his alleged breach of duty, we believe that assurance is insufficient, on its own, to establish the participation necessary to support a claim.

Nor is Park Place's alleged ratification of Kaufman's breach sufficient, either alone or in combination with plaintiff's other assertions, to establish wrongful means. The Catskill Group's "ratification" theory is drawn principally from *Diduck*, in which we affirmed the district court's finding that a defendant had participated in a union official's breach of fiduciary duty to an ERISA fund. 974 F.2d at 284. We held that the defendant's continued association with the union official and underpayments to the union, after the defendant was put on notice of the breach, crossed the threshold of tortious participation:

33

> Once put on notice of the breach, [the defendant] could not continue its
> association with [the union official] as if his conduct were not questionable. Its
> failure to inquire into the propriety of that conduct and take appropriate action was
> a substantial factor facilitating the breach. Making payments that [the defendant]
> knew or should have known "short-changed" the funds effectively ratified [the
> union official's] conduct.

*Id.*

*Diduck* is distinguishable, however, because the defendants' conduct of, *inter alia*, making short payments to the ERISA fund proximately caused a portion of the alleged injury. *See id.* In stark contrast, Park Place's dealings with Kaufman *after* the alleged breach occurred were not a substantial factor causing the Catskill Group any harm.

Moreover, the Catskill Group's claim that Park Place should be accountable simply because it continued associating with Kaufman after, and with knowledge of, his alleged breach cannot be squared with our decision in *S & K Sales Co.* There, we questioned the propriety of a jury instruction that permitted a finding of liability if the defendant "participated in [the third-party's] breach of his duty of loyalty, *or* that [defendant] knowingly accepted the benefits of [the third-party's] breach of his duty of loyalty." *S & K Sales Co.*, 816 F.2d at 849. It was the instruction's disjunctive "or"—and in particular the "knowing[] accept[ance]" prong of it—that troubled us. Ultimately, we did not in *S&K* resolve the issue of whether the challenged instruction was legally erroneous, because we found no prejudice to the defendant in light of the charge as a whole, which made clear that liability could attach only if the defendant both participated in the third-party's breach *and* if the defendant accepted the benefits of the breach. *Id.* at 849–50.

We now hold what we intimated in *S & K Sales Co.*: the knowing acceptance of benefits alone is insufficient to sustain a claim for *participating* in the breach of a fiduciary duty. *See id.* at

34

849 ("Nike could not have been prejudiced because the charge as a whole correctly conveyed to the jury the proper standard and emphasized the element of 'participation' as the essence of the claim.").

### C.    Park Place's Allegedly Improper Economic Pressure

Finally, we reject the Catskill Group's claim that Park Place used wrongful means, in the form of economic pressure, to interfere with the Catskill Group's business relations with the Tribe.  In particular, the Catskill Group claims that Park Place sought to capitalize on the Tribe's financial difficulty by agreeing to loan the Tribe $3 million in exchange for a contract giving Park Place exclusive development rights with the Tribe.

In *Carvel Corp.*, the New York Court of Appeals explained that for economic pressure to constitute wrongful means, such pressure must have been for the "sole purpose of inflicting intentional harm on plaintiffs." 3 N.Y.3d at 190, 785 N.Y.S.2d at 362, 818 N.E.2d at 1103 (quoting *NBT Bancorp, Inc.,* 215 A.D.2d at 990, 628 N.Y.S.2d at 408–10).  There is no evidence of that here; indeed, the evidence shows that Park Place offered the loan to promote its own legitimate business interests in the gaming industry.  As the district court succinctly explained:

> The situation here is relatively simple.  The Tribe needed money. Park Place had money.  The Tribe asked Park Place for money. Park Place had no obligation to give the Tribe any money.  So it bargained with the Tribe.  Both parties came to the decision that an exclusive casino development contract was a fair trade for the immediate $3 million loan.  That is not improper economic pressure.

*Catskill III*, 217 F. Supp. 2d at 439.  We agree.

Because the Catskill Group has failed to present a triable issue of fact on the required element of wrongful means, we affirm the district court's grant of summary judgment to Park Place dismissing the tortious interference with business relations claim.

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's judgments.